**In re Estate of Mark F. CORRIEA;
Avianca, Inc., et al.,
Appellants.**

**No. 97–PR–559.**

District of Columbia Court of Appeals.

Argued Sept. 8, 1998.

Decided Oct. 22, 1998.

John J. McDermott, Washington, DC, with whom Scott A. Mills was on the brief, for appellants.

Robert C. Bernius, Washington, DC, with whom Laurin H. Mills was on the brief, for appellee, Pacific Employers Insurance Company (INAPRO).

Before FARRELL and REID, Associate Judges, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge:

The Superior Court, Probate Division, granted summary judgment to appellee Pacific Employers Insurance Co. (INAPRO), the professional liability insurance carrier for a now-deceased attorney, Mark F. Corriea. Previously, the United States District Court for the District of Columbia had entered an approximately $1.4 million judgment against Corriea for breach of fiduciary duty in his legal representation of appellant Avianca, S.A., and related companies (hereafter Avianca).[1] When Avianca sought to enforce the judgment against the estate of Corriea, the estate denied the claim on the basis that there were no assets to satisfy the judgment. Avianca persisted in its claim by asserting that Corriea's professional liability policy with INAPRO was an asset of the estate.

The estate filed a third party claim against INAPRO, which, along with Avianca, filed motions for summary judgment.

Interpreting various provisions of the insurance policy, the Superior Court concluded as a matter of law that "there is no policy coverage whatsoever for what Corriea was found [by the District Court] to have done." On this appeal by Avianca, we hold that the Superior Court erred in granting summary judgment to INAPRO and that, save on one critical issue, it should have entered judgment as a matter of law for Avianca. The issue for which summary judgment is unsuitable is whether Corriea's actions fell within the policy exclusion for "any act [or] omission ... committed by the insured with actual dishonest, fraudulent, criminal or malicious purpose or intent." Contrary to the Superior Court's conclusion, the facts determined by the District Court—and accepted by the parties here—do not establish as a matter of law that Corriea acted with "dishonest ... intent" in the conduct underlying the judgment for breach of fiduciary duty. That issue must be resolved by a trier of fact before judgment may be entered for either side.

## I. Background

Beginning in 1980, Corriea entered into an attorney-client relationship with Avianca, thereafter representing the company in aircraft leasing, corporate financing, and government relations matters. In 1985, Avianca sued Corriea, his partner, and his law firm in the United States District Court for the District of Columbia alleging breach of fiduciary duty, fraudulent misrepresentation, and violation of the federal RICO statute. All but the breach of fiduciary duty allegations were later withdrawn. In 1989, the District Court (Lamberth, J.) entered summary judgment on liability for Avianca, concluding that in a series of three transactions Corriea had breached his fiduciary obligations in that he had "allowed his professional judgment on behalf of his clients to be adversely affected by acquiring and maintaining interests poten-

---

1. "Avianca, S.A." stands for Aerovias Nacionales de Colombia, S.A., the major airline and flagship carrier of the Republic of Colombia.

tially or actually in conflict with those of his clients."

The District Court found no issue of material fact in dispute. The Superior Court, in turn, "[took] the judgment" of the District Court "as it [found] it," including the operative facts. The parties on appeal likewise do not dispute the facts as determined by the District Court. As relevant to the present dispute, two transactions formed the basis of the District Court's judgment.

### A. Use of Norasco Funds

Corriea, as Avianca's attorney, incorporated a company named Norasco in 1980 and agreed to serve as Norasco's president and attorney. Avianca required Corriea to register title to the company in his name, but to endorse the Norasco stock over to Avianca's American subsidiary. From 1980 to 1982, Corriea admitted having withdrawn over $240,000 of Norasco's funds in checks payable to himself, his law firm, or Fund Sources International (FSI), a company wholly owned by him. He often used the funds for personal expenses, typically without Avianca's knowledge or consent, later insisting that as president and sole shareholder of Norasco he was entitled to use the corporate assets as he saw fit and for his own purposes.

### B. The Twin Otter Transaction

In 1981, Helicol, a partly owned subsidiary of Avianca, S.A., was negotiating the purchase of a Twin Otter aircraft from a Canadian aircraft company, DeHavilland. Andres Cornelissen, then an executive of Avianca, S.A., verified that Corriea could arrange lease financing for Helicol and instructed Helicol's general counsel to contact Corriea for help in obtaining the Twin Otter aircraft. Corriea, acting as the president of FSI, sent Helicol a proposal for lease of a Twin Otter and later, again acting as president of FSI, sought financing through a Canadian invest-

ment firm. By 1982, when he was still unable to obtain the financing, Helicol told him that it intended to buy the aircraft directly from DeHavilland. Corriea replied by telex that FSI would not accept Helicol's withdrawal and would consider it a violation of their agreement, subjecting Helicol to liability for FSI's losses. That same day, unknown to Helicol or Avianca, Cornelissen wired $247,000 into FSI's Chase Manhattan account. Corriea admitted using $130,000 of this loan to secure financing for the transaction, whereby FSI obtained two Twin Otter aircraft and leased them to Norasco for sublease to Helicol. Corriea admitted having represented both FSI and Norasco in the transaction.

### C. The District Court's Conclusion and Damage Award

The District Court determined as a matter of law

that defendant Corriea breached his common law fiduciary duties [2] owed [the Avianca] plaintiffs by virtue of his on-going, continuous attorney-client relationship with plaintiffs in the following particulars: First, in the purchase and lease of two Twin Otter aircraft, Corriea breached his fiduciary duty of undivided loyalty by failing to make an affirmative disclosure to plaintiffs of all material facts, legal implications, and potential conflicts, or gaining the informed consent of plaintiffs prior to acquiring and maintaining interests affecting the business of plaintiffs, entering into a business transaction with plaintiffs in which [Corriea] stood to gain profit, and acting as attorney for plaintiffs where [Corriea's] financial, business, property, or personal interests were or reasonably could have impaired the exercise of Corriea's independent, professional judgment for the protection and benefit of the plaintiffs. Specifically, the Court finds that defendant Corriea had an affirmative duty to make full disclosure to the plaintiffs in

---

**2.** Although recognizing that Avianca's suit was for breach of common law fiduciary duty, the District Court looked to the conflict of interest provisions of the (then prevailing) Disciplinary Rules as "defin[ing] the minimum level of professional conduct required of an attorney, such that a violation of one of the DRs is conclusive evi-

dence of a breach of the attorney's common law fiduciary obligations." The present case does not require us to consider the correctness of the District Court's understanding of the relation between the Disciplinary Rules (or the present Rules on Professional Conduct) and the common law tort.

their corporate capacities, and not merely to selected officers of the corporation. Thus, disclosure to Andres Cornelissen, then Executive Vice President of Avianca, S.A., was insufficient to meet the duty of full disclosure. Further, Corriea had a continuing affirmative duty to disclose all material facts, including not only the fact that he was the president of [FSI], but also that financing for the aircraft was supplied by an unsecured, personal loan or grant from Andres Cornelissen; that Corriea and Cornelissen had financial, business, property, and personal interests in common, and that Cornelissen's selection of [FSI], to complete the Twin Otter transaction was therefor[e] not impartial; that Corriea's representation of plaintiffs in the Twin Otter transaction could be adversely affected by his financial, business, and property interests in his corporation, FSI; that other corporations may have been more established and financially able to carry out the complex financing arrangements than the newly created FSI; and that FSI obtained substantial loans used to complete the transaction from competitors of plaintiffs, which could similarly adversely impact Corriea's professional judgment on behalf of plaintiffs.

Further,

> Corriea, again without making an affirmative, full disclosure or gaining the informed consent of plaintiffs, improperly commingled and appropriated to his own use funds and property of plaintiffs that were entrusted to him in his professional fiduciary capacity. Specifically, the Court finds that Corriea misappropriated for his own use $240,000.00 in Norasco funds.

After a bench trial on damages, the District Court ordered the estate of Corriea[3] to disgorge to Avianca net profits amounting to $1,415,075 from the Twin Otter transaction and to repay $34,461 from the unauthorized Norasco withdrawals for which reimbursement had not already been made. The court found disgorgement to be "an appropriate remedy," stating that "there is a pressing need for remedies in fiduciary duty cases …

that will serve to deter violations," and that "the power of the court to enforce the fiduciary duties attorneys owe to their clients gives the court broad powers to ensure that Mr. Corriea in no way profits from his breach."

### D. The Insurance Policy Provisions and the Superior Court's Ruling

As related above, Avianca sought to enforce the District Court judgment against Corriea's estate in Superior Court, and the issue ultimately became the scope of coverage of Corriea's professional liability insurance policy with INAPRO. The relevant policy provisions are as follows. As to coverage, Part I of the policy provides:

> The Company shall pay on behalf of the insured in excess of the deductible all sums which the insured shall become legally obligated to pay as Damages as a result of Claims first made against the insured and reported to the Company during the Policy Period *by reason of any act, omission, or Personal Injury caused by the insured or any person for whom the insured is legally liable in the rendering of or failure to render Professional Services for others.* [Emphasis added.]

The policy defines "professional services" as

> services rendered for others as an attorney, notary public, title insurance agent pursuant to a written agency agreement with a licensed title insurance company, and an administrator, conservator, executor, guardian, trustee, or in any similar fiduciary capacity, provided that such services are connected with and incidental to the insured's profession as an attorney.

Part II, Section C. The policy further defines "damages" as follows:

> Damages means any amount which the insured is legally obligated to pay for any Claim to which this insurance applies and shall include judgments and settlements: provided always that Damages *shall not include fines or penalties imposed by law or by other matters which may be deemed uninsurable under the law pursuant to*

---

**3.** Mark Corriea died in 1992; his wife, Barbara Harrison Corriea, was substituted as a party-

defendant in her capacity as personal representative.

*which this policy shall be construed.*
[Emphasis added.]

Part II, Section E. Finally, the policy declares:

THIS POLICY DOES NOT APPLY TO:
... any claim arising out of any act, omission or Personal Injury committed by the insured *with actual dishonest, fraudulent, criminal or malicious purpose or intent.*
[Emphasis added.]

Part VIII, Section A.

The Superior Court ruled first that Corriea's conduct fell within the exclusion for "actual dishonest[y]," stating:

The District Court, in essence, found that dishonesty had occurred because of the failure to make proper disclosures in the face of a clear conflict of interest. This conduct certainly falls within the reach of "dishonesty."

Second, the court inferred from the definition of "professional services" that, for coverage to obtain, Corriea had to have breached a fiduciary duty while performing—as he did not—specific fiduciary services of the kinds enumerated, *i.e.,* as "administrator, conservator, executor, guardian, trustee, or ... any similar fiduciary capacity." "The language of the policy," the court stated, "clearly refers to the role of the insured lawyer as a working fiduciary, in the sense of performing asset management and other specific decisionmaking based upon so-called 'substitute judgment' or based upon a 'best interests' analysis."

Third, Corriea's conduct also did not fall within "professional services" because he earned his profits in the Twin Otter transaction not as legal fees but "strictly in his role as sole owner of FSI":

It is undisputed that Helicol relied upon its own in-house lawyers for whatever legal representation it needed in this particular venture. In short, Corriea's conduct was not a product of "practicing law" on behalf of the Avianca plaintiffs as such, nor was this an instance of negligently practicing law.

Finally, focusing on the remedy of disgorgement, the Superior Court ruled that

there is no policy coverage for payment of monetary sanctions that are imposed either as an equitable remedy or as something that is functionally the same as punitive damages. The judgment appears to have certain punitive characteristics, in addition to being an equitable remedy.

On one hand, the judgment is "punitive," in the sense of being distinguishable from "compensatory" or specific damages for discrete harm done. As a practical matter, this Court must conclude that the object of the District Court's judgment was indeed to punish Corriea and to deter other lawyers from committing the same impropriety. The purpose of the judgment was clearly not to make the plaintiffs whole in the sense of calculating and bestowing compensatory damages based upon proven "injury," as such. In fact, Judge Lamberth paused to say that no discrete damages had been established by the plaintiffs.

## II. Discussion

On the basis of the facts determined by the District Court, and accepted by the parties, the Superior Court correctly saw that resolution of this suit depends on "characterization of the underlying conduct of Mark Corriea as something that is ... [or is not] insurable under the relevant malpractice policy."

### A. Legal Principles

This court reviews a grant of summary judgment *de novo* to ensure that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law. *Sutton v. Banner Life Ins. Co.,* 686 A.2d 1045, 1047 (D.C.1996). "Where there is doubt as to whether a genuine issue of fact has been raised, summary judgment is precluded." *West End Tenants Ass'n v. George Washington Univ.,* 640 A.2d 718, 725 (D.C.1994) (citation omitted). However, summary judgment cannot be avoided merely by demonstrating a disputed factual issue, *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C. 1979); the party opposing judgment must show that the fact is material and "that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the

truth at trial." *Id.* (citation and internal quotation marks omitted).

 "[W]here [insurance] contract language is not ambiguous, summary judgment is appropriate because 'a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.'" *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 693 (D.C.1993) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983)). An insurance contract is not "ambiguous merely because the parties do not agree on the interpretation of the contract provision in question." *Id.* at 694 (citation omitted). Whether an insurance contract is ambiguous is a question of law which this court reviews *de novo. Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990) (citation omitted). Further, "[u]nless it is 'obvious' that the terms used in an insurance contract are 'intended to be used in a technical connotation,' we must construe them consistently with 'the meaning which common speech imports.'" *Washington v. State Farm Fire & Cas. Co.*, 629 A.2d 24, 27 n. 6 (D.C.1993) (quoting *Pennsylvania Indem. Fire Corp. v. Aldridge*, 73 App.D.C. 161, 162, 117 F.2d 774, 775 (1941)).

We hold that summary judgment was wrongly granted to INAPRO. Indeed, but for the single, pivotal issue of whether Corriea's acts or omissions were done "with actual dishonest ... purpose or intent" so as to be excluded from coverage on that ground, Avianca would be entitled to summary judgment. As to that issue, we hold that the facts determined by the District Court (and conceded here) are not "'so one-sided that one party must prevail as a matter of law.'" *Hill v. White*, 589 A.2d 918, 921 n. 8 (D.C. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Trial is therefore necessary on that issue.

### B. "Professional Services"

As defined in the policy, the Superior Court construed "professional services" to mean something much more specific than the "common law fiduciary breach" found by the District Court. The policy, according to the Superior Court, "enumerates exactly what kinds of legal services fall into this category [of 'fiduciary' services]. They are: serving as an 'administrator, conservator, executor, guardian, trustee, or ... any similar fiduciary capacity.'" Corriea admittedly had not been a "working fiduciary" in any of these specific capacities, *doing no* "asset management," exercising no "'substitute judgment,'" and so forth.

 This reading of the policy definition is too narrow. The policy requires INAPRO to pay damages "by reason of any act, omission, or Personal Injury caused by the insured or any person for whom the insured is legally liable in the rendering of or failure to render Professional Services for others." "Professional Services" means any "services rendered for others *as an attorney*" (emphasis added), a point again made by the proviso that such services be "connected with and incidental to the insured's profession as an attorney." The definition enumerates certain "fiduciary capacit[ies]" such as "notary public, title insurance agent ..., administrator, conservator," etc., but these clearly are not meant to exhaust the meaning of "services ... as an attorney"; otherwise the requirement that they be "connected with and incidental to the insured's profession as an attorney" would be meaningless. Precisely because Corriea performed professional services for Avianca as an attorney, the District Court concluded that he "breached his fiduciary duty of undivided loyalty by failing to make an affirmative disclosure to [Avianca] of all material facts, legal implications, and potential conflicts, or [to] gain[ ] the informed consent of [Avianca] prior to acquiring and maintaining interests affecting [its] business."

The Superior Court also ruled that Corriea's actions were not "professional services" because he earned the profits from the Twin Otter transaction (in particular) not as "legal fees" but "strictly in his role as sole owner of FSI." In doing so he was "not ... 'practicing law' on behalf of the Avianca plaintiffs as such, nor was this an instance of negligently practicing law." This, however, reads into the policy a definition of "services rendered ... as an attorney" which the parties might have chosen to insert but did not, namely,

legal representation unaffected by any conflict of interest. The policy indemnified Corriea for damages he was required to pay by reason of any "act [or] omission" of his in rendering professional services for others. According to the District Court, Corriea breached his fiduciary duties "by virtue of his on-going, continuous attorney-client relationship with [Avianca]" and his failure ("omission") *during* that relationship to disclose the potential conflicts created by his ownership interest in FSI and gain the client's informed consent thereto. The court stressed that Corriea and his law firm "were continuing to bill [the Avianca] plaintiffs for legal services, and receive further assignments, throughout the relevant period." Thus, Corriea's *simultaneous* conduct as attorney and entrepreneur—"[wearing] too many hats," as the District Court "put it colloquially"—was the breach of fiduciary duty. Nothing in the INAPRO policy implies that such continued representation, marred but not severed by the failure to disclose a conflicting interest, falls outside the ambit of the covered professional services as an attorney. Indeed, the policy's express exclusion for acts or omissions done with "dishonest [or] fraudulent ... purpose," see discussion in part II.D., *infra*, implies rather that a conflicted representation carried on "in good faith and without consciousness of wrong doing"[4] stands on no different footing than, say, negligent representation. In sum, the policy affords no reason why the words "services rendered ... as an attorney" should not be given their normal meaning, *see Washington v. State Farm Fire & Cas. Co., supra*, instead of the contrived meaning of representation untainted by a breach of fiduciary duty.

### C. "Damages"

The Superior Court ruled that the disgorgement ordered by the District Court was

"either ... an equitable remedy or ... something that is functionally the same as punitive damages," but in either case was not based on any "proven 'injury'" and hence not "damages" within the meaning of Part II.E. of the policy. On appeal, INAPRO specifically points to the exclusion for "matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed," and argues that since disgorgement and punitive damages "share a common purpose—the deterrence of wrongful conduct"—they should be deemed equally uninsurable under District of Columbia law.

■ INAPRO's premise that punitive damages are legally "uninsurable" under District law is one we need not evaluate,[5] because we reject the equation of disgorgement and punitive damages. The remedy of disgorgement, much like that of a constructive trust, is meant "to provide just compensation for the wrong, not to impose a penalty"; it is "given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 399, 60 S.Ct. 681, 84 L.Ed. 825 (1940).[6] The distinction was made clear by the Supreme Court of Minnesota in holding that a liability policy covered attorney's fees which had been ordered forfeited or disgorged after a breach of fiduciary duty:

[D]amages measured by the forfeit of attorney fees for breach of fiduciary duty are not "exemplary or punitive damages," as that phrase is used in the policy, and therefore that exclusion is not applicable....

The fee forfeiture serves to provide the injured client with a remedy, but it also has the effect of punishing the attorney for the breach of fiduciary duty and deterring further lapses in professional conduct....

---

**4.** *See* RESTATEMENT SECOND (AGENCY) § 389, Comment a, at 205–06 (1958), which states that an agent's failure to reveal an interest in the transaction permits the principal to rescind the transaction even though "the agent acts in good faith and without consciousness of wrong doing."

**5.** In *Curry v. Giant Food Co. of the District of Columbia*, 522 A.2d 1283, 1290 & n. 12 (D.C. 1987), we noted that the court had left this issue

open in *Salus Corp. v. Continental Cas. Co.*, 478 A.2d 1067, 1071–72 (D.C.1984).

**6.** Similarly, "[t]he purpose of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrong." *Heckmann v. Ahmanson*, 168 Cal. App.3d 119, 214 Cal.Rptr. 177, 188 (Cal.App. 1985).

Nevertheless, though similar, we do not think forfeiture damages and punitive damages are generally considered to be the same thing. While a forfeiture may punish, the aim is to make amends to the client—to "put right" the attorney-client relationship that has been tainted. Forfeiture of a fee may occur irrespective of the intent and motives of the attorney[;] punitive damages, however, require a willful indifference to the rights of others. The outer limits of a fee forfeiture cannot exceed the amount of the earned fee; the outer limits of a punitive damages award, on the other hand, have no fixed boundary.

*Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 214 (Minn.1984) (citations and footnotes omitted). *See also Snepp v. United States*, 444 U.S. 507, 515–16, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (constructive trust remedy "conform[s] relief to the dimensions of the wrong"; "since the remedy reaches only funds attributable to the breach, it cannot saddle the [fiduciary] with exemplary damages out of all proportion to [the] gain"); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 552–53 (Cal.1992) ("The only non-punitive monetary relief available [under the relevant statute] is the disgorgement of money that has been wrongfully obtained....").

■ The fact that Avianca was not able to quantify the damages it suffered from the Twin Otter transaction[7] does not disqualify the profits ordered disgorged as "just compensation for the wrong." *Sheldon, supra.* As a result of the breach of duty, Avianca was deprived of Corriea's independent professional judgment that, to take one example cited by the District Court, "other corporations may have been more established and financially able to carry out the complex financing arrangements [for the aircraft purchase] than the newly created FSI." Disgorgement of the net profits rectified that wrong in a manner that "conform[ed] ... to [its] dimensions." *Snepp*, 444 U.S. at 515, 100 S.Ct. 763. Indeed, as the District Court explained, failure to order disgorgement in lieu of unproven damages would "leave [Avianca] without a remedy" and "also gut fiduciary law." We decline to hold such restitution "uninsurable" under the District's law and therefore beyond the coverage provided by the INAPRO policy.[8]

**D. "[D]ishonest ... purpose or intent"**

We come then to the final ground on which the Superior Court granted summary judgment to INAPRO. By its terms the policy does not apply to claims arising out of "any act [or] omission ... committed by the insured with actual dishonest ... purpose or intent." "[I]n essence," the Superior Court stated, "[t]he District Court ... found that dishonesty had occurred because of the failure to make proper disclosures in the face of a clear conflict of interest." And "[t]his conduct"—the judge added—"certainly falls within the reach of 'dishonesty.'" The issue is a close one, particularly as to what the District Court termed the Norasco "misappropriation,"[9] but we conclude that the Superior Court erred in holding that the issue

---

7. No such concern with quantification exists as to the unauthorized Norasco withdrawals, which the evidence established in the amount of $240,000, and which Corriea either repaid voluntarily or was ordered to pay (minus certain deductions) as a "debt to Norasco."

8. In the absence of controlling District of Columbia law on the point, the Superior Court judge looked to Maryland law and relied on *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir. 1987), for the proposition that disgorgement of profits, as an equitable remedy, is not a form of "damages" for purposes of coverage under Maryland insurance law. In *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (Md.1993), however, the Court of Appeals of Maryland held that *Armco* had "misperceive[d]" the law of Maryland insofar as it ruled that "'damages' imports a distinctively legal meaning in insurance matters." *Id.* 625 A.2d at 1032. Since (as in the present case) nothing in the insurance policy indicated that the *Armco* parties intended "a special or technical meaning" to the term the court gave it its "ordinary and accepted meaning as used ... by reasonably prudent laypersons" and concluded: "'Damages' in common usage means the reparation in money for a detriment or injury sustained. The reasonably prudent layperson does not cut nice distinctions between the remedies offered at law and in equity." *Id.* 625 A.2d at 1032, 1033.

9. On the other hand, the parties acknowledge that the Norasco debt is barely a fly on the back of the elephant-judgment awarded by the District Court.

of Corriea's purpose or intent (a) had been resolved by the District Court or (b) could be resolved in this case as matter of law and not fact.

First, the District Court made no finding as to Corriea's intent because it determined that that issue could not be decided on summary judgment, and Avianca ultimately withdrew the counts that put Corriea's specific intent at issue—fraudulent misrepresentation and civil RICO violations—before they could be submitted to a jury.[10] On the one hand, the District Court characterized Corriea's breach of fiduciary duty as "patent and egregious," marked by "secret arrangement[s]" and "self-dealing." On the other, the court was careful to state that its conclusion of a breach of fiduciary duty did not entail a "find[ing] that Corriea's conduct was willful." Specifically, as to the Twin Otter transaction, the court ruled that there were "genuine disputes concerning Corriea's intent" that only the jury could resolve. Even as to Corriea's unauthorized withdrawal of $240,-000 from Norasco, the court stated: "While the court has held that he did not provide sufficient disclosure to avert a breach of fiduciary duty charge, a jury could infer [either] that he did not intend to deceive Avianca" or, to the contrary, that his actions were "fraudulent" and a "deception." What the District Court determined, in short, was that Corriea "patently breached ... his fiduciary duty of undivided loyalty" to Avianca, but that whether he did so with intent to deceive—sufficient to support a finding of fraud—had to be left to the trier of fact.

INAPRO contends that ultimately this distinction does not matter because this court has recognized that conduct by an attorney may be "dishonest," *see* Rule 8.4(c), District of Columbia Rules of Professional Conduct (1998), even though not done with intent to deceive. Thus, in *In re Shorter,* 570 A.2d 760 (D.C.1990), a disciplinary case, we interpreted former DR 1–102(A)(4) (identical in its operative terms to present Rule 8.4(c)) as follows:

The most general term in DR 1–102(A)(4) is "dishonesty," which encompasses fraudulent, deceitful, or misrepresentative behavior. In addition to these, however, it encompasses conduct evincing "a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness...." *Tucker v. Lower,* 200 Kan. 1, 4, 434 P.2d 320, 324 (1967). Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.

*Id.* at 767–68 (footnote omitted); *but see In re Hutchinson,* 534 A.2d 919, 923 (D.C.1987) (en banc) ("In the absence of affirmative proof of a fraudulent intent or state of mind, we hold that Hutchinson's misdemeanor conviction did not establish a violation of DR 1–102(A)(4)."). We take as a given that, for disciplinary purposes, dishonesty does not always depend on a finding of intent to defraud or deceive. *See also In re Addams,* 579 A.2d 190, 191–92 (D.C.1990) (en banc) (intentional, unauthorized use of client funds suffices to prove dishonesty under DR 1–102(A)(4)). But that point is not conclusive in this case in which we interpret the language of an insurance policy, specifically an exclusion for acts or omissions committed "with actual dishonest, fraudulent, criminal or malicious *purpose or intent* " (emphasis added).

■ The INAPRO policy does not define "dishonest ... purpose or intent," and so we look to the meaning of the terms which common speech imports. *Washington v. State Farm Fire & Cas. Co.,* 629 A.2d at 27 n. 6. Standard dictionaries, exemplified by WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 363 (1988), define "dishonest" as implying "a willful perversion of truth in order to deceive, cheat, or defraud." [11] BLACK'S LAW DICTIONARY 468 (1990) similarly defines "dishonesty," in the first instance, as a "[d]isposition to lie, cheat, deceive, or defraud." "Intent" is "the 'design, resolve, or determination' with which a person acts," *Witters v. United States,* 70 App.D.C. 316, 319, 106 F.2d 837, 840 (1939); when used as a legal term, it

---

10. INAPRO makes no argument of issue preclusion based on Avianca's withdrawal of those counts.

11. *See also* THE AMERICAN HERITAGE DICTIONARY 534 (1992) (defining "dishonest" to mean "[d]isposed to lie, cheat, defraud, or deceive").

"more strongly implies a fixed course pursued deliberately." AMERICAN HERITAGE DICTIONARY 668 (1985). In combination, we interpret the words "dishonest ... purpose or intent" in the policy to mean an intent to deceive or defraud. Additional support for that reading comes from the adjectives accompanying "dishonest" in the policy, *i.e.*, "fraudulent, criminal or malicious." *See District of Columbia v. Estate of Parsons*, 590 A.2d 133, 136–37 (D.C.1991) (applying principles of *noscitur a sociis* and *ejusdem generis*). Further, in choosing between a broad understanding of dishonest intent as embracing general "lack of ... probity" or "straightforwardness," *In re Shorter*, 570 A.2d at 768 (citing *Tucker v. Lower*, 200 Kan. 1, 434 P.2d 320, 324 (1967)), and the more specific meaning of intent to deceive or defraud, we are guided by the maxim that exclusions from coverage in an insurance policy will be construed narrowly, *see Loffler v. Boston Ins. Co.*, 120 A.2d 691, 693 (D.C.1956) ("It is the duty of the insurer to spell out in plainest terms any exclusionary or delimiting policy provisions."), and that an ambiguity will be construed against the insurer. *See Meade v. Prudential Ins. Co.*, 477 A.2d 726, 728 (D.C.1984).

We hold, therefore, that to justify refusal of coverage under the exclusion for acts or omissions done with "actual dishonest ... purpose or intent," INAPRO had to prove [12] that Corriea intended to deceive Avianca in not disclosing the facts which created the conflict of interest. Specifically, INAPRO had to prove that in failing to disclose his conflicting roles, Corriea intended to keep Avianca in the dark about facts that he knew, or reasonably could not help but know, might affect its business judgment if known to it.

Whether Corriea had that intent cannot be decided on summary judgment. Intent generally is an issue ill-suited for determination as a matter of law, *see, e.g., Willis v. Cheek*, 387 A.2d 716, 719 (D.C.1978), and the District Court, far more intimately familiar with the evidence of Corriea's behavior than the Superior Court or this court so far,

concluded that his breaches of fiduciary duty, glaring though they were, left unresolved whether he intended to deceive Avianca in either the Norasco withdrawals or the Twin Otter financing. Corriea's lengthy affidavit in opposition to summary judgment (both here and in the District Court) disavowed any intention to deceive or defraud Avianca. That disavowal, of course, had no bearing on the breach of fiduciary duty since "the standard of fiduciary conduct is objective. If the attorney committed a breach, ignorance [or] honorable intentions ... cannot remedy or excuse the wrong that occurred." 2 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 14.3, at 237–38 (4th ed.1996). But, just as the evidence placed in issue Corriea's intent for purposes of the fraud and RICO counts before the District Court, so it precludes resolution as a matter of law of whether he acted with "dishonest ... intent or purpose" within the meaning of the INAPRO policy.

### III.

The judgment of the Superior Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

12. INAPRO had the burden of proving by a preponderance of the evidence that Corriea's conduct fell within the exclusion. *See Watkins v.*

*Atlantic Life Ins. Co.*, 198 A.2d 911, 912–13 (D.C. 1964).