Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 9, 2010        Decided March 8, 2011

No. 10-7049

SUSAN WHITING, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,
APPELLANT

v.

AARP AND UNITEDHEALTHCARE INSURANCE COMPANY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00455)

———

*Michele F. Raphael* argued the cause for appellant. With her on the briefs were *Lester L. Levy* and *Tracy D. Rezvani*.

*Scott M. Edson* argued the cause for appellee UnitedHealthcare Insurance Company. *William D. Coston* argued the cause for appellee AARP. With them on the brief were *Kenneth L. Blalack*, *Brian D. Boyle*, *David J. Sandler*,

*John F. Cooney*, and *Martin L. Saad*.  *Michael R. Schuster* entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Susan Whiting purchased medical insurance from United Healthcare Insurance Company ("United") after receiving a letter and brochure describing the insurance from the American Association of Retired Persons ("AARP"), of which she is a member.  Upon having emergency gall bladder surgery a year later, she submitted her medical bills to United only to be told that inpatient pathology and radiology services were not covered. Although United paid the costs of her surgeon and for ten physician visits and room and board at the hospital, Whiting was left to pay nearly forty thousand dollars in medical bills. She sued AARP and United, on behalf of herself and others, alleging breach of contract, fraud under the D.C. Consumer Protection Procedures Act ("the Consumer Act"), and she also sued AARP for unjust enrichment.  The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted.  Upon *de novo* review, *see Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), we affirm.

Applying the meaning that common speech imports to the insurance contract, which is governed by District of Columbia law, we conclude that the contract is not ambiguous.  It includes sections on what services are and are not covered and includes notations limiting coverage that are directly relevant to Whiting's circumstances.  But even assuming that a reasonable person would be led astray by the absence of either the word

"only" or an explicit exclusion of inpatient radiology and pathology services in the "*WHAT IS COVERED*" section, and/or various other provisions in the Certificate of Insurance ("the Certificate") that do not contain relevant limitations, Whiting's breach of contract claims fail. The chart contained in the brochure that she received from AARP stated that "only" outpatient pathology and radiation services are covered, a word that in the context in which it appeared can only be understood to exclude non-outpatient services. For similar reasons, her statutory fraud and unjust enrichment claims also fail. Further, the district court did not err in denying Whiting's motion to take judicial notice of congressional materials or in dismissing the complaint with prejudice.

## I.

According to the complaint, in August 2007 Whiting received a marketing letter and promotional materials from AARP on the "AARP Medical Advantage Plan" ("the Plan"), which was characterized as a "bridge" insurance plan underwritten by United targeted at retirees and unemployed AARP members who were not yet eligible for Medicare. The marketing letter included the following statements: The Plan "is for those who are "between jobs, retired early, or find [themselves] needing primary health insurance"; the Plan "is not major medical, yet [it] provides essential health benefits at an affordable price"; the Plan "is a smart option if you need essential health benefits right now"; the Plan offers "the reassurance that comes with knowing that you can see a doctor when you need to, get lab tests, and more . . . ," and "provides fixed cash benefits for covered services, including . . . [l]ab tests — up to $ XXX per day," presumably an amount specified in the actual letter sent to Whiting; and the Plan offers three levels of coverage, bronze, silver, and gold, and "plan limitations and

exclusions, and additional details on available plan options" are found in the enclosed brochure.

The enclosed brochure included the following statements: The Plan "is not a major medical health plan, but is a good option if you need essential health benefits today at an affordable price.  This plan provides valuable benefits that lower total out-of-pocket expenses on covered medical services, and also offers you some coverage until you qualify for Medicare.  You'll get fixed cash benefits for a wide range of health care expenses — including doctor's visits, lab tests, prescriptions, and much more"; and AARP members should apply if: (i) "you are without coverage," (ii) "you need a 'bridge' until Medicare," and (iii) "you need to lower your medical costs."  In addition, a full-page chart contained in the brochure stated that under the bronze, silver, and gold coverage levels, "Hospital Inpatient" benefits include a fixed daily payment.  For Gold plan members, this amount is $1,500 per day.  Under a subheading marked "Additional Benefits," the chart stated that the Plan allots a per procedure maximum payment for "Lab/Pathology (Outpatient Only)" and "Radiology (Outpatient Only)."  The chart also stated that a separate "Outpatient Hospital Benefit" is subject to an annual payment cap.

Whiting applied for the Plan and selected the gold coverage level.  She was successfully enrolled and was issued the Certificate, which provided insureds thirty days "to examine your certificate" and "decide you do not want this coverage" for a full refund.  The first page of the Certificate states, in pertinent part:

Benefits are payable as shown in the SCHEDULE OF BENEFITS for the following:

- HOSPITAL INPATIENT STAYS
- HOSPITAL OUTPATIENT SERVICES
- EMERGENCY ROOM/OUTPATIENT OBSERVATION CARE
- SURGERY
- RADIOLOGY SERVICES
- LABORATORY/PATHOLOGY SERVICES
- HEALTH CARE PRACTITIONER SERVICES
- POST-HOSPITAL CARE

In the "*WHAT CERTAIN TERMS MEAN*" glossary to the Certificate, "Covered Service(s)" is defined to mean "[s]tays or services incurred while your coverage is in force," within a standard of care, necessary for prevention or treatment of a medical condition, and certified by a physician. "Laboratory/Pathology Services" and "Radiology Services" are defined by reference to the Physicians' Current Procedural Terminology.

The Certificate's "*WHAT IS COVERED*" section states that United will pay for "the following covered stays and services which are not otherwise excluded (see WHAT IS NOT COVERED)." It continues: "If you are confined in a Hospital as an inpatient, the Hospital Inpatient Stay Benefit is payable beginning on the second day of a covered Hospital Inpatient Stay," as set forth in the Schedule of Benefits. The section further states that "[i]f you incur a charge for a covered outpatient service . . . a Hospital Outpatient Benefit is payable" as set forth in the Schedule of Benefits. The section then lists a series of services — none of which were provided to Whiting — covered under the "Hospital Outpatient Benefit." Separately, the section describes the radiology benefit as follows:

> 5) **Radiology Benefit** – If you incur a charge for a Radiology Service performed in an outpatient setting, a Radiology Benefit is payable, up to a maximum of $2,700.00 per procedure. The applicable Radiology Benefit, as shown in the SCHEDULE OF BENEFITS, will be determined based on the service performed . . . . Separate benefits will not be paid for the technical and professional components of a Radiology Service.

> Note: If you are admitted to the Hospital as an inpatient directly from the emergency room or observation room, no Radiology Benefits are payable for services performed while you were confined in the emergency room or observation room.

The Laboratory/Pathology Benefit section immediately follows, and it is identical in substance and format except the limit is $1,600 per procedure rather than $2,700.00.

The "*WHAT IS NOT COVERED*" section lists various coverage exclusions, none of which apply here.

The *"SCHEDULE OF BENEFITS"* provides that the Hospital Inpatient Stay Benefit for surgical inpatients is $1,500.00 per day. The Hospital Outpatient Benefit amount is set forth in a separate list of outpatient procedures and subject to a $50,000 annual cap. The Radiology Benefit and Laboratory/Pathology Benefit are subject to the aforementioned per-procedure caps, and the specific amounts payable are set forth in a separate list naming various procedures; it includes no reference to inpatient or outpatient status.

Beginning in or about October 2007, Whiting commenced making monthly premium payments of $247 (which increased to $264.25 once she turned 60 years old the next year). A year later, on September 23, 2008, she was admitted to the emergency room at the Banner Desert Medical Center ("Banner Desert") in Phoenix, Arizona for medical problems related to her gall bladder. Later that day, she was admitted as an inpatient at Banner Desert. On September 26, 2008, she had surgery to remove her gall bladder, and she was released the following day.

Banner Desert billed Whiting for $44,368.95, including room, board, medication, supplies, laboratory/pathology

services, and radiology services. United paid $4,500.00, comprising three days of the $1,500 inpatient benefit, but refused to pay for any of the laboratory/pathology or radiology services because they "were performed in an inpatient setting." Compl. ¶¶ 29, 32. United separately paid the surgeon's costs and for ten patient visits.

Whiting sued United and AARP on March 5, 2009, alleging: (1) breach of the Certificate; (2) breach of the agreement between AARP and United, an agreement to which she claims she is a third party beneficiary; (3) violation of the Consumer Act, D.C. Code § 28-3901 *et seq.*; and (4) unjust enrichment by AARP for accepting royalties from United. Whiting also sought certification of a class of similarly situated plaintiffs. United and AARP filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Whiting filed an opposition and also requested that the district court take judicial notice of proceedings before the Senate Finance Committee that was investigating AARP for misleading marketing of AARP branded medical benefit policies. The district court, after staying any discovery and declining to take judicial notice, granted the motion to dismiss. *Whiting v. AARP*, 701 F. Supp. 2d 21 (D.D.C. 2010).

## II.

On appeal, Whiting contends that her complaint states a plausible basis for a jury to find against United and AARP given the allegedly convoluted and contradictory language of the Certificate and the misrepresentations in their joint marketing materials and in the Certificate that the AARP medical insurance plan has characteristics, uses, and benefits that it did not have, namely coverage for inpatient laboratory/pathology and radiology expenses.

The parties agree that ambiguities in insurance contracts must be construed against the insurer, *Old Am. Ins. Co. v. Tucker*, 223 A.2d 334, 336 (D.C. 1966); *see also Roberts v. State Farm Fire & Cas. Co.*, 705 P.2d 1335, 1336-37 (Ariz. 1985), differing only with regard to whether the Certificate was ambiguous. As the D.C. Court of Appeals has held, it "'is the insurer's duty to spell out in plainest terms — terms understandable to the man in the street — any exclusionary or delimiting policy provisions.'" *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (quoting *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999)).

Whiting maintains that for a "reasonable AARP member," the Certificate does not clearly and unambiguously state that the pathology and radiology benefits are available *only* for outpatient services. Specifically, Whiting notes that pathology and radiology benefits are discussed four times in the Certificate without any reference to whether the services are performed in an inpatient or outpatient setting: see (1) the front page of the Certificate, which refers to the "*SCHEDULE OF BENEFITS*" for more details, (2) the "*SCHEDULE OF BENEFITS*," (3) the "*LIST OF PROFESSIONAL SERVICES*" (which does not qualify benefit amounts by reference to whether services are performed on an inpatient or outpatient basis), and (4) the glossary ("*GUIDE TO YOUR CERTIFICATE*"). Further, the Certificate repeatedly lists another category of benefits called "Hospital Outpatient Services," which does not include the services rendered here. Also, she notes, the "*WHAT IS COVERED*" section does not expressly exclude inpatient radiology and pathology services, and she maintains that the structure of the Certificate would lead a reasonable person to focus instead on the *"SCHEDULE OF BENEFITS"* and other sections.

So Whiting suggests that an average person reading the Certificate could readily and reasonably conclude that the fact that certain services are labeled "Hospital Outpatient Services" and the radiology and pathology benefits are listed separately from that category and are not described in the "*SCHEDULE OF BENEFITS*" as "outpatient only" indicates that those latter benefits are available irrespective of the setting in which they were provided. Only if she had read the "*WHAT IS COVERED*" section would she have found any reference to the outpatient setting for these benefits. She maintains that the absence of the word "only" (which appears in the brochure but not in the Certificate) from the "*WHAT IS COVERED*" section means that even the language contained therein need not be read exclusively. But the other language in the section concerning emergency room treatment indicates that an exclusive (i.e., outpatient only) reading is the best interpretation of the relevant subsections of the "*WHAT IS COVERED*" section. In the context of the Certificate taken as a whole, she suggests, however, that the single reference to an "outpatient setting" for the radiology and pathology benefits is insufficiently clear to render unambiguous whether the benefit is available for inpatient radiology and pathology services.

United and AARP respond that the rule requiring construction against the insurer "has no application where no ambiguity exists," *Old Am. Ins. Co.*, 223 A.2d at 336, and they contend, as the district court concluded, 701 F. Supp. 2d at 26-27, this is such a case, pointing to the text of the "*WHAT IS COVERED*" section that radiology and laboratory/pathology benefits are available for services "performed in an outpatient setting." (They also point out that this language is consistent with the promotional materials designating those benefits as outpatient only, but the promotional materials are extrinsic to the contract and thus may not be considered unless the contract is ambiguous. *See Travelers Indem. Co. of Ill.*, 770 A.2d at 986

(quoting *In re Corriea*, 719 A.2d 1234, 1239 (D.C. 1998));
*Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).)

Whiting's contentions thus present the question of what standard a court is to apply in deciding whether the Certificate is ambiguous or unambiguous. At the outset, it is clear that the law of the District of Columbia governs the contract claims, because the Certificate contains a choice of law clause that the Plan is governed by District of Columbia law and under District of Columbia law such clauses govern "'as long as there is some reasonable relationship with the state specified.'" *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)). AARP, the Plan sponsor, is based in the District of Columbia, and therefore effect should be given to the contractual choice of law clause.

The D.C. Court of Appeals has instructed that the court's duty is to "interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy," *Travelers Indem. Co. of Ill.*, 770 A.2d at 986. It explained that "'[u]nless it is obvious that the terms used in an insurance contract are intended to be used in a technical connotation, [the court] must construe them consistently with the meaning which common speech imports.'" *Id.* (quoting *In re Corriea*, 719 A.2d 1234, 1239 (D.C. 1998)). The court concluded: "'[I]t is the insurer's duty to spell out in plainest terms — terms understandable to the man [or woman] in the street — any exclusionary or delimiting policy provisions.'" *Id.* (quoting *Cameron*, 733 A.2d at 968). From this we understand the reference to "the man [or woman] in the street" to require a court to interpret the contract based on "the meaning which common speech imports," *id.*, and not based on any analysis of how Whiting herself would read the contract.

Whiting suggests that the court should take into account the probable educational attainment and sophistication of the target audience of this mailing, perhaps implying that the seniors in need of a "bridge to Medicare" to whom the Plan was targeted are especially unsophisticated. But Whiting points to no case in which local or federal courts in the District of Columbia have relied on the vaguely-asserted characteristics of a targeted demographic in interpreting a contract. Rather, the analysis is based on the "nature of language in general," *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006), and the interpretation must be consistent "with the meaning which common speech imports." *Travelers*, 770 A.2d at 986. Although a court must be careful not to view "the man [or woman] in the street" as a legally trained or other professional or necessarily even a college graduate, *cf. Walker v. Nat'l Recovery, Inc.*, 200 F.3d 500, 501 (7th Cir. 1999), the requirement that the terms of insurance contracts be plainly set forth presupposes that a person of average intelligence would be able to understand those plain terms. Thus, subject to the qualification for technical connotation, if an insurance contract states in plain terms what is covered, then "the man [or woman] in the street" should be able to understand what is said.

Whiting acknowledges that a reasonable person would read the whole Certificate, as the Certificate itself admonishes: "PLEASE READ YOUR CERTIFICATE CAREFULLY." The Certificate begins, after stating the thirty-day right to examine the Certificate and the limitation for pre-existing conditions, with a "*GUIDE TO YOUR CERTIFICATE*," by listing the sections and the pages on which they can be found. It then defines who is eligible to be covered and the terms used in the Certificate. The next section is "*WHAT IS COVERED*." It is followed by the "*WHAT IS NOT COVERED*" section. The "*SCHEDULE OF BENEFITS*" appears only after three more sections — *GENERAL MATTERS*, *WHEN YOUR COVERAGE*

*STOPS*, and *BENEFITS AFTER YOUR COVERAGE STOPS*. Nonetheless, Whiting would place little emphasis on the notion that "the man [or woman] in the street" would want to know what medical services were covered under the Certificate, and that the logical place to find such information would be in the section of the Certificate titled "*WHAT IS COVERED*." In other words, the common sense approach of "the man [or woman] in the street" would appear to require the court to focus on the statement of what is covered in order to determine whether the Certificate unambiguously states that among the covered services are outpatient radiology and pathology services. And, given the section's title, a reasonable person would understand that only those items listed in the section are covered by the policy, subject to the further exclusions in the "*WHAT IS NOT COVERED*" section, and that no coverage will be available for anything not listed in the what-is-covered section. Once knowing what was covered and what was excluded among covered services, it would appear most likely such a person would then turn to the schedule for payment amounts and caps, not vice versa as Whiting suggests.

Looking to the plain terms of the "*WHAT IS COVERED*" section, a reasonable person would have to conclude that inpatient radiology services are not covered under the Certificate based on the sentence that reads: "If you incur a charge for a Radiology Service performed in an outpatient setting, a Radiology Benefit is payable, up to a maximum of $2,700.00 per procedure." There is no equivalent sentence for radiology benefits performed in an *inpatient* setting, leading a reasonable person to conclude that benefits are payable only in an outpatient setting. Further, the "Note" that follows precludes payment for outpatient radiology services if the policyholder is thereafter admitted as an inpatient. This note, which addresses circumstances similar to those experienced by Whiting, would resolve any doubt as to whether inpatient radiology services

would be payable under the Certificate, because, as the district court concluded, it would be nonsensical for inpatient and outpatient services to be covered, but not outpatient services when followed by admission as an inpatient. *Whiting*, 701 F. Supp. 2d at 26. The same reasoning holds true for inpatient pathology services, because the paragraphs that follow contain identical language, including the limiting "Note," substituting "Laboratory/Pathology" for "Radiology" and $1,600.00 for $2,700.00.

But even if Whiting is correct that the Certificate's other references to these benefits, lacking any mention of the inpatient or outpatient settings, would confuse "the man [or woman] in the street," her breach of contract claim still fails because the promotional materials clear up any ambiguity. Whiting agrees that the promotional materials, which are attached to the motion to dismiss, may be considered on the motion to dismiss and we agree. The documents are referred to and relied on in the complaint, *see 188 LLC v. Trinity Industries*, 300 F.3d 730, 735 (7th Cir. 2002); *Bedall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *cf. In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005), and such extrinsic materials are to be considered in a breach of contract dispute if the contract is ambiguous, *see Holland*, 456 A.2d at 815. A full page chart included with the materials that Whiting received before applying for coverage states that the laboratory/pathology and radiology benefits were "(Outpatient Only)". No reasonable person could construe these words to include coverage for *in*patient laboratory/pathology and radiology services, and Whiting appears to acknowledge as much by maintaining that the absence of the word "only" from the "*WHAT IS COVERED*" section of the Certificate is what renders ambiguous the language in that section. The extrinsic evidence thus makes clear the meaning of the contract, and dismissal of the breach of contract claim was appropriate.

Whiting's other contentions also fail:

1. Whiting's claim that she is an intended third party beneficiary of the agreement between AARP and United to offer the Plan to AARP's members is redundant of the breach of contract claim. *Whiting*, 701 F. Supp. 2d at 27-28. As such an intended beneficiary, Whiting alleges that United breached its obligation to AARP to provide insurance to its members. Due to the stay of discovery, she has not obtained the Group Policy or any other agreements between AARP and United; nor have AARP or United made these agreements part of the record. But Whiting does not allege that the scope of AARP's and United's contractual obligations to her could extend beyond a duty to provide insurance pursuant to the terms of the Group Policy, and there is no allegation or suggestion that the Group Policy terms differ in any way from the Certificate.

2. Assuming, as Whiting maintains, the Consumer Act applies to the promotional materials and the Certificate, under District of Columbia law a claim "of an unfair trade practice is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer." *Pearson v. Soo Chung*, 961 A.2d 1067, 1075 (D.C. 2008). Whiting points to language in the promotional materials promising "essential health benefits" and "[a]ffordable health insurance" and maintains these phrases would have "a tendency to mislead," D.C. Code § 28-3904(e), or otherwise cause a "reasonable consumer to believe that the laboratory/pathology and radiology costs incurred would be covered." Appellant's Br. 37. In other words, for her statutory claim to succeed, Whiting must prove that a reasonable person would interpret the promotional materials and the Certificate to mean that inpatient radiology and laboratory/pathology services were covered. Citing *Walker v. Nat'l Recovery, Inc.*, 200 F.3d 500, 502 (7th Cir. 1999), a case involving notice under the Fair Debt Collection Practices Act

("FDCPA"), Whiting maintains that this court cannot decide on a motion to dismiss whether a reasonable person would tend to be misled by the promotional materials. In the fraud context, however, this court has held that materials can be nonmisleading as a matter of law if no reasonable person would be misled. *Trudeau v. FTC*, 456 F.3d 178, 194 (D.C. Cir. 2006). It is worth noting, moreover, that circuit courts of appeal to address the question have rejected the *Walker* approach and concluded that courts can find debt collection notices not to be confusing as a matter of law under the FDCPA. *See Wilson v. Quadramed Corp.*, 225 F.3d 350, 353 n.2 (3d Cir. 2000); *Terran v. Kaplan*, 109 F.3d 1428, 1432-33 (9th Cir. 1997); *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33, 35 (2d Cir. 1996). We agree with the principle underlying these cases and that the district court could appropriately grant a motion to dismiss on a deceptive practices claim if no reasonable person would be so deceived.

Contrary to Whiting's view, no reasonable person could read the broad, general promotional statements contained in the marketing materials to have the specific meaning that Whiting proposes. Even if they could be read that way taken alone — and were not, as the district court found, accurate and non-misleading statements or mere puffery, *Whiting*, 701 F. Supp. 2d at 29 — the context refutes her proposed interpretation. The promotional materials refer repeatedly to an enclosed brochure "for plan limitations and exclusions," and the brochure contains a chart that states that the laboratory/pathology and radiology benefits are outpatient only. This limitation is repeated in the "*WHAT IS COVERED*" section of the Certificate. Thus, reading them together, no reasonable person could read the promotional materials and Certificate and understand them to mean that inpatient radiology and laboratory/pathology services were covered under the Plan. Dismissal of the statutory claim was therefore warranted.

3.  Whiting's unjust enrichment claim also was properly dismissed.  She maintains that AARP received royalties from her purchase of the Plan and that, in the circumstances, retaining these royalties would be unjust.  Whiting acknowledges, however, that the survival of this claim depends on the validity of her breach of contract or statutory claim, because AARP's enrichment would otherwise have been entirely just.

4.  The district court did not abuse its discretion in denying Whiting's motion for judicial notice of materials relating to the Senate Finance Committee's investigation of AARP's practices relating to sponsored health insurance plans.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5110.1 (2d ed. 2005).  Although the district court may take judicial notice in ruling on a motion to dismiss, s*ee Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007), the matters to be noticed must be relevant, and the Senate Finance Committee materials are irrelevant to disposition of the motion to dismiss, which turns on the adequacy of the well-pleaded factual allegations in the complaint, which are assumed to be true, *Atherton*, 567 F.3d at 681.  Whiting acknowledges, moreover, that the Senate Finance Committee materials merely "contain[] facts alleged in the Complaint," Appellant's Br. 44, and thus the materials are redundant and unnecessary to disposition of the motion to dismiss.

5.  There is no merit to Whiting's contention that the district court should have afforded her leave to amend her complaint, based on the footnote in her opposition to the Rule 12(b)(6) motion requesting leave if any of her claims is dismissed.  That footnote did not satisfy the requirement that a motion to amend provide some "indication of the particular grounds on which amendment is sought." *City of Harper Woods Emps' Retirement Sys. v. Olver*, 589 F.3d 1292, 1304 (D.C. Cir. 2009) (internal

quotation marks omitted). Instead, the footnote merely stated that "if this Court finds that [Whiting] has improperly plead [sic] any element of the claims asserted, she respectfully requests that she be given an opportunity to replead same." Pl.'s Opp'n Br. 3 n.2. The problem with Whiting's case is not improper pleading; it is that her claims are legally defective, and she did not identify any new claims or allegations that would cure the defects. She did not do so in opposing the motion to dismiss or by filing a motion to amend her complaint pursuant to Federal Rule of Civil Procedure 15; nor did she file a motion for reconsideration of the order dismissing her complaint pursuant to Federal Rule of Civil Procedure 59(e). Dismissal of the complaint with prejudice was therefore appropriate.

Accordingly, we affirm the order dismissing the complaint for failure to state a claim upon which relief can be granted.