In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1607 & 99-1908

CAST NORTH AMERICA (TRUCKING) LIMITED,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.


On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board.


Argued October 26, 1999--Decided March 29, 2000


   Before HARLINGTON WOOD, JR., KANNE, and DIANE P. WOOD,
Circuit Judges.

   HARLINGTON WOOD, JR., Circuit Judge.  This case is
before the court on a petition for review and a
cross-application for enforcement of an order of
the National Labor Relations Board ("NLRB" or
"the Board") requiring Cast North America
(Trucking) Limited ("Cast") to recognize and
bargain with Local 299, International Brotherhood
of Teamsters, AFL-CIO ("Local 299") as the
exclusive bargaining representative of the
company's drivers, mechanics, and yard personnel.
The order followed an election in which the
covered employees were offered the choice between
representation by Local 299, representation by
the Chicago Truck Drivers, Helpers & Warehouse
Workers Union ("CTDU"), or no union
representation. Based on the election results,
the NLRB certified Local 299 as the exclusive
bargaining representative for the covered
employees. Despite this certification, Cast
refused to recognize and bargain with Local 299.
As a result, Local 299 filed a charge with the
NLRB. Cast responded by admitting its refusal to
bargain but challenging the propriety of the
NLRB's certification of Local 299. The NLRB found
for Local 299 and ordered Cast to bargain with
the union. This appeal followed.

I.  BACKGROUND

Cast is a Canadian corporation in the business of transporting containers of goods for import and export. Cast operates trucking facilities in Detroit, Michigan and Chicago, Illinois. In April 1997, Local 299 filed a petition with the NLRB requesting a representation election for the drivers, mechanics, and yard personnel in Cast's Detroit facility. At that time, these employees were being represented by the CTDU. Following a hearing, the NLRB Regional Director ("Regional Director") concluded that the appropriate bargaining unit was a single unit consisting of the drivers, mechanics, and yard personnel at both the Detroit and Chicago facilities and directed a representation election for that unit. The election was originally scheduled as a two-session manual election with voting to take place at both the Chicago and Detroit terminals. After Cast expressed concern that some voters might be prevented from voting in person in a manual election due to the nature of the long-haul trucking business, all of the parties verbally agreed, with the approval of the Regional Director, to conduct the election by mail ballot. The Regional Director was prepared to conduct the election by mail; however, Local 299 then notified the Regional Director that it had changed its mind and preferred a manual election. The Regional Director, without accompanying explanation, directed a manual election to be held on June 5, 1997 with voting to be allowed from 4:00 a.m. to 7:00 a.m. and again from 4:00 p.m. until 7:00 p.m.

The election took place as scheduled. As previously noted, the ballots offered the covered employees the choice between representation by Local 299, representation by the CTDU, or no union representation. There were approximately sixty-eight eligible voters, and sixty-two votes were cast. Thirty-three employees voted in favor of representation by Local 299, and twenty-nine employees voted for representation by the CTDU. No votes were cast in favor of no union representation. On June 16, 1997, the CTDU, as Intervenor, filed objections to the election with the NLRB, asking the NLRB to set aside the election on the grounds that five eligible employees were not given the opportunity to vote. The CTDU specifically asserted that four of these employees were prevented from voting through no fault of their own but rather due to the conduct of Cast. Cast joined in the CTDU's objections, stating that exigent business needs obligated it to schedule the four drivers on deliveries that caused them to miss the election.

A hearing was held on the objections before an NLRB hearing officer. The following evidence was presented concerning the circumstances

surrounding the failure to vote of the five employees identified in CTDU's objections, Edward Walinski, Darrell Wright, John Zanazaro, Richard Craig, and Michael Schiring. On June 4, 1997, Edward Walinski was dispatched to Detroit to pick up a load for delivery to a customer in North Dakota. Walinski reached his destination in North Dakota at 6:00 a.m. on June 5, the day of the election. At that time, he was 630 miles away from Chicago and could not have driven back in time to vote in the election. From North Dakota, Walinski was dispatched directly to Oregon, Illinois to pick up a load. He did not return to Chicago until the day after the election, June 6. Darrell Wright was dispatched from the Chicago terminal at 2:00 a.m. on the day of the election, June 5, to deliver a load to Hutchinson, Minnesota, which is over 450 miles away from Chicago. Wright did not return to Chicago until noon on June 6.

John Zanazaro returned to the Chicago terminal at 9:40 p.m. on June 4, 1997, after completing a delivery to Wisconsin. Before leaving the terminal for the evening, Zanazaro observed from the posted schedule that he was assigned to leave the following morning at 8:00 a.m. for a delivery to Dubuque, Iowa followed by a pick up in Oregon, Illinois. The drivers at the Chicago facility are assigned deliveries on a "first in, first out" basis. Under this system, drivers receive their assignments for the next day in the order in which they return to the terminal. It is Cast's policy that a driver must take no less than ten hours off between assignments. This policy is based on Department of Transportation safety regulations which require that drivers be given eight consecutive hours off duty between long-haul assignments. See 49 C.F.R. sec. 395.3. The Cast drivers' off-duty time is increased from eight to ten hours between assignments to allow the drivers time to commute between the Cast facility, located on the north side of Chicago, and their homes, most of which are south of the city. Zanazaro clocked in for work at 7:14 a.m. on June 5. When his supervisor arrived, shortly before 8:00 a.m., Zanazaro asked if he could pass on the assignment or switch runs with another driver because he was afraid that his scheduled run would prevent him from returning to the terminal in time to vote in the afternoon session. The supervisor denied Zanazaro's request due to a lack of substitute drivers. Zanazaro left on the run as scheduled and did not return to the terminal until after 9:00 p.m. that evening.

On June 4, 1997, Richard Craig returned to the Chicago terminal from a delivery at 10:58 p.m. Before leaving the terminal for the evening,

Craig observed from the posted schedule that he was scheduled to leave the following morning at 9:00 a.m. for a delivery to Wisconsin followed by a pick-up in Michigan. Craig returned to the terminal between 8:40 and 8:45 a.m. on June 5 and asked the supervisor if he could switch runs so he could vote in the afternoon session. The supervisor informed Craig that there were no substitute drivers available. Craig left on the run as scheduled and did not return to the terminal until 7:00 a.m. on June 7.

Michael Schiring was absent from work due to a hunting vacation the week of the election. Schiring had prepaid for this trip prior to the scheduling of the election and would be forced to forfeit the money he had paid if he canceled. When the notice of election was posted, Schiring inquired about obtaining an absentee ballot, informing his supervisor that he wanted to vote but did not want to forfeit the money he had paid for his vacation. The supervisor advised Schiring that voting had to be done in person and that there was no provision for absentee ballots. Schiring went on his trip as scheduled and did not vote in the election.

On October 8, 1997, the NLRB issued a Hearing Officer's Report on Objections to Conduct Affecting Results of the Election. The hearing officer found that of the five employees only two, Walinski and Wright, were prevented from voting through no fault of their own, a number insufficient to affect the outcome of the election. Therefore, the hearing officer recommended that the objections be overruled. Cast then filed Exceptions to the Hearing Officer's Report with the NLRB, arguing that the hearing officer erred in failing to find that a determinative number of voters were deprived of the opportunity to vote and that the Regional Director erred in failing to direct a mail election. On June 30, 1998, a three-member NLRB panel issued a split decision adopting the hearing officer's findings and recommendations and holding that a certification of representative should be issued in favor of Local 299. One panel member filed a dissenting opinion, stating that he would sustain the objections and set aside the election on both grounds argued in Cast's Exceptions. Despite the NLRB panel decision, Cast refused to bargain with Local 299, asserting that the certification of representative was erroneously issued. Local 299 then filed a charge with the NLRB alleging that Cast's refusal to bargain violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. sec. 158(a)(1), (5). The NLRB General Counsel issued a complaint and notice of hearing on the charge. Cast filed an answer

admitting its refusal to bargain but disputing the propriety of Local 299's certification. On January 29, 1999, a three-member NLRB panel granted summary judgment in favor of the General Counsel, holding that Cast failed to offer any newly discovered and previously unavailable evidence or to allege special circumstances that would require a reexamination of the NLRB's June 30, 1998 decision in the initial representation proceeding. The panel concluded that Cast's conduct constituted an unfair labor practice and ordered Cast to cease and desist from refusing to bargain with Local 299. On March 16, 1999, Cast filed a petition for review with this court. On April 19, 1999, the NLRB filed a cross-application for enforcement of its order. We have jurisdiction pursuant to 29 U.S.C. sec. 160(e) and (f).

## II.  ANALYSIS

Our review of the NLRB panel decision is "decidedly deferential." Dunbar Armored, Inc. v. NLRB, 186 F.3d 844, 846 (7th Cir. 1999). The panel's "'reasonable inferences may not be displaced on review even though [we] might justifiably have reached a different conclusion . . . .'" Id. (quoting U.S. Marine Corp. v. NLRB, 944 F.2d 1305, 1313-14 (7th Cir. 1991) (en banc)). We regard the NLRB panel's findings of fact as conclusive as long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. sec. 160(e). We give similar deference to the panel's legal conclusions. Dunbar Armored, 186 F.3d at 847. Because the panel's January 29, 1999 order on the unfair labor practice charge is based on findings made in the initial representation proceeding, the record in the representation proceeding is also before this court. 29 U.S.C. sec. 159(d).

Cast raises two challenges to the panel decision. First, Cast asserts that the panel's determination that employees John Zanazaro and Richard Craig were not deprived of the opportunity to vote in the election was not supported by substantial evidence. Secondly, Cast argues that the Regional Director's decision to hold a manual rather than a mail ballot election was both erroneous and unsupported and, therefore, should be overturned.

The NLRB will set aside election results when the conduct of a party to an election causes an employee to miss the opportunity to vote if (1) the employee's vote is determinative and (2) the employee was disenfranchised through no fault of his own. Sahuaro Petroleum & Asphalt Co., 306 N.L.R.B. 586, 1992 WL 46429 (1992). In its June 30, 1998 order, the NLRB panel concluded that

Zanazaro and Craig's failure to vote could not be attributed to their employer's conduct, noting that the two men were off duty during the morning voting session. Cast disagrees, arguing that company policy together with Department of Transportation regulations created an employment obligation which prevented Zanazaro and Craig from returning to the terminal in time to vote in the morning voting session. Cast asserts that company policy "required that [the drivers] be away from the terminal during the 10 hour off-duty period set aside for obtaining 8 hours of sleep and commuting to and from the terminal." Therefore, Cast argues Zanazaro and Craig's position was indistinguishable from that of Walinski and Wright in that all four men were prevented from voting due to employment obligations.

Cast asserts that the NLRB panel's finding that Cast company policy and Department of Transportation regulations did not require that the drivers use their off-duty time to obtain eight hours of sleep was contrary to the substantial weight of the evidence. However, the Department of Transportation regulations require only that drivers have "8 consecutive hours off duty." 49 C.F.R. sec. 395.3 (emphasis added). Under the regulations, a driver is considered to be on duty "from the time [he] begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work." Id. sec. 395.2. While the regulations are designed to prevent a driver from operating a commercial vehicle while his "ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue to operate the motor vehicle," id. sec. 392.3, nowhere do they require that drivers get a specific amount of sleep. The Cast supervisor's testimony before the NLRB hearing officer further confirms this point. The supervisor testified as follows:

Q:Now, the eight hours off that is required by Department of Transportation regulations, that just means they [the drivers] can't be working, correct?

A:That's correct.

Q:And whatever they do on their own time is up to them? I mean, if they don't need sleep, they don't need sleep. But they do whatever they want to do, correct?

A:That's correct.

Because the Cast ten-hour off-duty policy is derived from the Department of Transportation regulations, adding two hours for commuting to the required eight off-duty hours, our analysis of the regulations applies to our company policy analysis as well. Furthermore, although the Cast supervisor testified that it was "a policy that the driver had to have eight hours of sleep," there is no evidence that Cast took steps to regulate the drivers' conduct in their off-duty hours other than to tell the drivers to make sure that they take their time off and to recommend that "they get at least eight hours sleep, or whatever they need." Similarly, there is no evidence to support Cast's contention that Zanazaro and Craig would have been violating company policy had they arrived at the terminal prior to 7:00 a.m. on June 5. In fact, both men clocked in that day after having been away from the terminal for less than ten hours./1

Under the facts of this case, it is clear that Zanazaro and Craig were not prevented from voting due to employment obligations. Both men were off duty and in the vicinity of the Chicago facility during the morning voting session. In fact, Zanazaro clocked in just fourteen minutes after the morning polling session ended. There is substantial evidence to support the NLRB's conclusion that the number of employees prevented from voting through no fault of their own was insufficient to affect the outcome of the election.

In the alternative, Cast raises two challenges to the Regional Director's decision to conduct a manual election. The NLRB has wide discretion in the administration of representation elections. See Kwik Care Ltd. v. NLRB, 82 F.3d 1122, 1126 (D.C. Cir. 1996). The NLRB has delegated a portion of this authority to the Regional Directors who have discretion to determine election arrangements, including whether the election should be conducted manually or by mail ballot. San Diego Gas & Elec., 325 N.L.R.B. 218, 1998 WL 414986, at *2 (1998).

Cast's first challenge is procedural. Cast contends that the Regional Director's decision to conduct a manual election rather than an election by mail ballot should be overturned because the Director failed to articulate the reasons underlying his decision. Cast, however, failed to raise this procedural argument before the NLRB. Under 29 U.S.C. sec. 160(e), "[n]o objection that has not been urged before the Board . . . shall be considered by the court unless failure to urge such objection shall be excused because of extraordinary circumstances." This is a jurisdictional bar, designed to allow the NLRB

the first opportunity to consider objections and to ensure that reviewing courts receive the full benefit of the NLRB's expertise. NLRB v. Howard Immel, Inc., 102 F.3d 948, 951 (7th Cir. 1996). "Accordingly, to effectively preserve an issue, the respondent's exception must apprise the Board of the issue that the responding party intends to press on review sufficiently enough that the Board may consider the exception on the merits." Id. (citing Marshall Field & Co. v. NLRB, 318 U.S. 253, 255 (1943)). Cast contends that it sufficiently raised the issue in its "Opposition" to the General Counsel's motion for summary judgment filed in the unfair labor practice proceeding. In the Opposition, Cast asserted that Zanazaro and Craig's failure to vote resulted from the Regional Director's refusal to schedule an election by mail ballot. Cast argued only that the Regional Director's decision to hold a manual election was based on improper criteria. Specifically, Cast argued:

[T]he Regional Director was unwilling to direct a mail ballot which he originally was willing to conduct apparently simply because one of the parties no longer was willing to agree to a mail ballot election. This was not an appropriate basis on which to determine this issue, and certainly was inconsistent with the Board's precedent concerning the long distance trucking industry and its recent ruling in San Diego Gas which expressly calls for the exercise of reasoned discretion by the Regional Director in determining whether it would be appropriate to direct a mail ballot.

This is insufficient to preserve an argument as to the Director's failure to articulate the reasoning behind his decision. Additionally, the record does not reflect any extraordinary circumstances which would excuse Cast's failure to raise this issue before the NLRB. Therefore, Cast has waived the right to bring this argument in this court.

Cast further contends that the Regional Director's decision to hold a manual election was substantively erroneous because it was "clearly inconsistent with the Board's own guidelines." Cast cites the NLRB's recent decision in San Diego Gas, 325 N.L.R.B. 218, 1998 WL 414986, to support its argument that "the Board's recent guidelines clearly call for a mail ballot election in the present situation." However, the panel in San Diego Gas expressly stated that it was "clarifying the circumstances under which it is within the Regional Director's discretion to direct the use of mail ballots." Id. at *3

(emphasis added). San Diego Gas does not hold that mail ballot elections must be held in all cases in which they may be appropriate, but rather reaffirms the broad discretion enjoyed by the Regional Directors in determining which type of election is appropriate. Id. We need not decide whether a mail ballot election may have been a better alternative in the present case./2 It is clear from the record that the Regional Director explored the possibility of a mail ballot election, see id. at *4, to the point of tentatively scheduling one. Furthermore, Cast asserts that if the Regional Director based his decision to order a manual election on Local 299's refusal to consent to a mail ballot election, this decision was erroneous because "the direction of a mail ballot election is not supposed to be conditioned on a unanimous agreement by the parties." However, under San Diego Gas, "the desires of all of the parties" is one proper factor for the Director to consider in the exercise of his discretion. Id. at *3. We cannot say that the Regional Director's failure to order a mail ballot election constitutes an abuse of discretion given the facts of the present case.

III.  CONCLUSION

   The NLRB's order shall be enforced.


/1 The testimony before the NLRB hearing officer was that Zanazaro returned to the terminal at 9:40 p.m. The supervisor estimated that, by the time Zanazaro dropped off his cargo and completed his paperwork, Zanazaro would not have left the yard until 10:00 or 10:15 p.m. Even based on the time of his return to the terminal, Zanazaro had not been off duty for a full ten hours when he clocked back in at 7:14 a.m. on June 5. Craig returned to the terminal from a delivery at 10:58 p.m. on June 4. Assuming Craig left the terminal soon after his return, he had not been away from the terminal for a full ten hours when he returned to work between 8:40 and 8:45 a.m. on June 5.

/2 The NLRB has noted that historically voter turn out has been higher in representation elections that are conducted manually than in those conducted by mail ballot. San Diego Gas, 325 N.L.R.B. 218, 1998 WL 414986, at *3. While a variety of factors influence this statistic, see id., it is worthwhile to note that in the election at issue in the present case, despite the inconsistent nature of the long-haul trucking business, sixty-two of the approximately sixty-eight eligible voters exercised their right to

vote.