# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 18, 2011       Decided July 3, 2012

No. 10-1382

CHEVRON MINING, INC., FORMERLY KNOWN AS THE
PITTSBURGH & MIDWAY COAL MINING COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 11-1006

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

*Eugene Scalia* argued the cause for petitioner. With him
on the briefs were *Olusola Ayanbule* and *Amir C. Tayrani*.

*MacKenzie Fillow*, Attorney, National Labor Relations
Board, argued the cause for respondent. With her on the brief
were *David S. Habenstreit*, Assistant General Counsel, and
*Usha Dheenan*, Supervisory Attorney. *Jeffrey J. Barham*,
Attorney, entered an appearance.

*Deborah Stern* argued the cause and filed the brief for *amicus curiae* United Mine Workers of America in support of respondent.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Senior Circuit Judge* WILLIAMS.

GRIFFITH, *Circuit Judge*: In 2005, Chevron Mining, Inc. amended its employee bonus plan in response to the decision of the United Mine Workers of America to call "memorial period" work stoppages. The National Labor Relations Board concluded that the amendment was an unfair labor practice, and we agree.

I

Before the Board, the parties agreed on a set of facts, exhibits, and issues presented. We rely on those stipulations.

The United Mine Workers of America (the Union) and Chevron Mining, Inc. (CMI) are parties to separate collective bargaining agreements (CBAs) at four mines, including the North River Mine in Alabama where this dispute arose. Since 1978, the CBAs have included a clause that gives the Union the ability to call "memorial periods."[1] A memorial period,

---

[1] The agreements are substantially identical to the National Bituminous Coal Wage Agreement (NBCWA), which serves as a model for the industry and is negotiated periodically between the Union and the Bituminous Coal Operators Association. The

which may last one or more days at one or more mines, is an unpaid work stoppage.

In 1995, the Union and CMI executed a Letter of Agreement allowing Union-represented employees to participate in CMI's employee bonus plan. The plan provides bonus payouts based on financial and safety achievements at an employee's mine. The Agreement gives CMI the authority to change the bonus plan unilaterally and provides that disputes over such changes are not arbitrable. If the Union objects, its sole recourse is to quit the Agreement.

In February and July of 2004, the Union, after providing proper notice, called six memorial days at the North River Mine to place economic pressure on CMI over ongoing grievances that were being arbitrated. Stipulation of Facts ¶ 31 [hereinafter "Stip."]. (The record does not reveal the nature of those grievances.) The work stoppages cost CMI $1.5 to $2.5 million in pre-tax profit, but CMI took no immediate action in response.

On February 3, 2005, CMI amended the bonus plan to provide that no financial achievement bonus would be paid to Union-represented employees at any mine where the Union calls a memorial day that doesn't cover all mines in the same district,[2] "regardless of whether that mine has met all of its financial targets under the Plan in that year." *Id.* ¶ 33. At the same time, citing its parent company's "best year ever in 2004," CMI offered a one-time 6% bonus that paid $700,000 to Union-represented employees at the North River Mine. *Id.*

---

NBCWA has contained an identical "memorial periods" provision since 1971.

[2] "Districts are part of the Union's organizational structure that have geographic boundaries, although the boundaries are not related to the location of a single employer's mines." Stip. ¶ 16.

¶ 30. Since then, the Union has called only district-wide memorial days, so no bonuses have gone unpaid because of the amendment.

In April 2005, the Union filed charges with the NLRB alleging that CMI's amendment to the bonus plan was retaliation for the Union's exercise of its contractual right to call memorial day work stoppages at the North River Mine. The General Counsel issued a complaint in October 2005, and the parties stipulated to the following issue presented:

> Whether, under *Wright Line*, [252 N.L.R.B. 1083 (1980),] the Employer violated Sections 8(a)(3) and (1) of the Act by amending its collectively-bargained bonus plan, which generally permits unilateral Employer amendment or modification of the plan, to deny a mine's Union-represented employees financial bonuses under the plan if the Union called a Memorial Day at that mine, pursuant to the "Memorial Periods" provision of the parties' underlying collective bargaining agreement, on a non-UMWA District wide basis.

Parties' Stmt. of Issues Presented.

In a decision issued in September 2010, the Board concluded that the amendment to the bonus plan was an unfair labor practice. The Board determined that the Union's use of memorial periods to place economic pressure on CMI in support of pending grievances was protected activity. The Board then found a violation under *Wright Line* and rejected CMI's defenses as either unconvincing or barred by the stipulation. CMI filed a petition for review in this Court, and the Board filed a cross-application for enforcement. We take jurisdiction over the application and petition under 29 U.S.C. §§ 160(e) and (f), respectively.

5

II

We must first determine whether the employees' participation in the 2004 memorial days was protected under the National Labor Relations Act, 29 U.S.C. §§ 151-169. It is well-established that the exercise of a right grounded in a CBA is protected by the Act. *See NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984) (reaching this conclusion based on section 7 of the Act's protection of "the right to . . . bargain collectively"). Action taken to discourage the exercise of such a right violates section 8(a)(3), 29 U.S.C. § 158(a)(3), which makes it an unfair labor practice for an employer "to discourage" participation in protected union activities by "discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment," *see Radio Officers' Union v. NLRB*, 347 U.S. 17, 39-40 (1954), and also violates section 8(a)(1), 29 U.S.C. § 158(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" protected rights, *see Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983). The question before us is whether the CBA permits these memorial period work stoppages, which were called to pressure CMI about arbitrable Union grievances.

It is also well-established that an agreement to arbitrate labor disputes "gives rise to an implied obligation not to strike over such disputes." *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 381 (1974); *see also Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 248 (1970) ("[A] no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration."). This rule reflects the policy favoring "the arbitral process as a substitute for economic warfare." *Teamsters' Local v. Lucas Flour Co.*, 369 U.S. 95, 105 (1962). The parties remain free, of course, to

"expressly negate any implied no-strike obligation" through an "explicit expression" of their intent to do so. *Gateway Coal*, 414 U.S. at 382. The Union argues that the memorial period clause does just that.

The clause reads: "The [Union] may designate memorial periods not exceeding a total of ten (10) days during the term of this agreement at any mine or operation provided it shall give reasonable notice to the Employer." On the one hand, the text does not, by its terms, limit the purposes for which memorial periods may be called. The sole limits on their use are procedural: only ten days of work stoppage may be called during the contract term, and reasonable notice of each must be given. On the other hand, CMI argues that the term "memorial period" itself implies a limitation. Relying on the dictionary definition of "memorial," CMI urges that a memorial period can only be called "to commemorate the death of a miner or a mining disaster." Pet'r's Br. 26; *see* WEBSTER'S II NEW COLLEGE DICTIONARY 700 (3d ed. 2005) (defining "memorial" as "[s]omething, as a monument or a holiday, designed or established to preserve the memory of a person or event"). CMI also notes that the memorial periods clause appears in the CBA just before a provision for plant "closing following fatal accident."[3] To CMI, this placement reinforces the idea that both provisions are meant to commemorate death and disasters. But these are also the only two provisions in the CBA that expressly allow work stoppages. Thus, the placement might only reflect that both provisions permit work stoppages, not that they allow work stoppages for the same purpose. Because the text does not

---

[3] That provision reads, "In addition to the memorial period provisions to be designated under section (j) work shall cease at any mine on any shift during which a fatal accident occurs." Joint Motion for Submission of Case Ex. C, at 191.

speak directly to the question of the purposes for which a memorial period may be called, we must turn to extrinsic evidence of the parties' intent. *See Wilson & Sons Heating & Plumbing v. NLRB*, 971 F.2d 758, 761 (D.C. Cir. 1992); *Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d 1027, 1036 (D.C. Cir. 1986) ("[T]he words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent.").

Before the Board, the parties stipulated that "[t]he history and purpose of the Memorial Periods Clause was addressed in" a district court opinion, two arbitration decisions, and a memorandum from the Board's Division of Advice, each of which the parties incorporated into their Stipulation of Facts. Stip. ¶ 17. Both parties used these materials in making their arguments, and the Board relied upon them to conclude the CBA authorized the Union to use memorial periods to strike. *See Pittsburgh & Midway Coal Mining Co.* (*P&M*), 355 N.L.R.B. 1210, 1213 (2010).

Each of the materials addresses the history and purpose of the NBCWA's identical memorial periods clause. Most relevant is the district court decision, *Arch of W. Va. v. Mine Workers Local Union 5958*, C.A. No. 2:96-2008 (S.D. W. Va. Nov. 25, 1996), which addressed the very question before us. *Arch* involved a dispute over whether employees could miss work at the start of deer hunting season despite a company policy that prohibited more than 15% of the workforce from taking off the same day. Even though the dispute was subject to arbitration, "Union representatives threatened to call a 'memorial period' [on four days] if [the company] did not make concessions on the deer hunting issue." *Id.* at *4 ¶ 8. When the employer did not concede, the Union notified the employer it was calling the memorial days. *Id.* at *4 ¶¶ 9-10. The employer sought injunctive relief establishing that

memorial days could not be called in connection with arbitrable disputes, but the court held that they could even though the CBA contained an implied no-strike obligation under *Gateway Coal*. In so holding, the court explained that:

> [The CBA] gives the Union a *unilateral* right to call a memorial period, which should be *untrammeled and uninfringed* by court scrutiny, as has been shown by the lengthy history of memorial periods' inclusion in NBCWA contracts, case authority, and arbitration decisions. . . . It is not the Court's role to scrutinize the motivation for calling memorial periods. . . . [T]he unilateral right to call memorial periods is a bargaining chip that the Union can use in an often 'fractious' relationship that exists between labor and management in the coal industry.

*Id.* at *5-6 (emphasis added).[4]

All the other stipulated materials also cut against CMI's reading of the clause, but none contradicts *Arch*. CMI repeatedly quoted to us language from one of the arbitration decisions indicating that a "memorial period is commonly understood to be a time set aside to observe the memory of a particular event or person," but consistently omitted the rest of the paragraph, which reads:

> [B]ut in recent years, memorial periods under this provision have been used to provide Employees with

---

[4] The memorial days in *Arch* were ultimately used to bypass arbitration altogether rather than to apply pressure in an ongoing dispute. But the real power of memorial periods as interpreted by *Arch* and the Board is the threat to use them to apply pressure in an ongoing dispute, *see NLRB v. Lion Oil Co.*, 352 U.S. 282, 291 (1957), as was done by the Union in *Arch*.

> time off work to participate in certain activities deemed important by the International Union, and have also been used to provide a cooling off period in the course of a work stoppage in the coal fields. *There is no limitation in the contract which restricts the purpose for which a memorial period may be used*, just as long as reasonable notice of the designation is given to the Employer.

*Peabody Coal Co.*, Arb. No. 88-23-91-72, \*7 (Nov. 8, 1991) (emphasis added). And in the other arbitration decision the employer and union agreed and the arbitrator concluded that "[c]ontractually, the union has the right to call memorial days without giving a reason for the call." *United Mine Workers Dist. 17, Local 781 v. E. Associated Coal Corp.*, Arb. No. 02-17-04-176, \*16 (Feb. 28, 2005).

The memorandum from the Board's Division of Advice took the view that "the Union has called memorial periods for a wide range of purposes: to mourn the death of miners and to commemorate mining disasters as well as to obtain unpaid leave for unit employees during negotiations for a new contract or close to the expiration of an existing contract." Joint Motion for Submission of Case Ex. L, at 2. The memorandum also noted that other regional divisions of the Board had concluded that the Union does not violate its duty to bargain in good faith by using memorial days to "apply[] economic pressure in support of its bargaining position." *Id.* at 2 n.2. The memorandum again indicates that memorial days can be used for more than memorializing: they are a permissible means to apply economic pressure against the company during bargaining.

Read together, the materials that the parties agreed "address" the "history and purpose of the clause" show unambiguously that a memorial period may be called to strike

over an arbitrable dispute. As counsel for the Union explained at oral argument, the NBCWA's memorial period clause was negotiated in 1971 in response to the problem of debilitating wildcat strikes.[5] The clause gives the Union a contractually limited and controlled method to channel employee displeasure and thereby avoid such disruption, to the benefit of both the Union and employers. Oral Arg. Tr. 30-32.

CMI now argues that little or no weight should be given to these materials because the stipulation itself "does *not* state that the decisions *correctly* 'addressed' the clause's history or purpose." *See* Pet'r's Reply Br. 6 (emphasis in original). This argument is too clever by half and fails to account for the only credible explanation for the stipulation: that the parties meant that these materials should be used as reliable extrinsic evidence of their intent. "[S]tipulations, like other contracts, must be interpreted in light of the circumstances under which the agreement was made." *Nat'l Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 307 (D.C. Cir. 1982).[6]

---

[5] *See* Julius G. Getman, *The Protection of Economic Pressure by Section 7 of the National Labor Relations Act*, 115 U. PA. L. REV. 1195, 1244 n.197 (1967) ("'Wildcat' is a vague concept which is used primarily to describe strikes in breach of a no-strike clause or strikes to which the union is opposed.").

[6] Our dissenting colleague thinks the parties' stipulation is meaningless. To make that point, he creates a hypothetical in which unnamed parties for unknown reasons agree that "the history and purpose of the United States Constitution is addressed in Max Farrand's THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES (1913)." He thinks that such an agreement is "parallel" to the stipulation we must construe. The only "parallel" we can see is the use of the phrase "the history and purpose is addressed in." The dissent overlooks the circumstances of the stipulation in this case and who made it. The hypothetical would be more "parallel" to the stipulation in our case if one could imagine that those who drafted

CMI also argues that the materials referenced in the stipulation should be disregarded because each lacks precedential effect in this court. It is no doubt true that we would not rely as heavily on these materials if the parties had not agreed that we must. The issue is not a question of precedence but of the parties' intent, and the stipulation was designed to answer that question of fact. Even if the dissent were right that *Arch*'s broad view of the proper use of memorial periods is dicta (and we disagree that it is), the parties have agreed that *Arch* addresses the meaning of their clause. That fact gives the discussion in *Arch* authority, not its legal reasoning or precedential weight.

It is significant as well that when the Union called memorial days in support of pending grievances in this case, CMI did not even suggest that the CBA had been breached or that the Union had committed an unfair labor practice. CMI sought neither injunctive relief (as the employer did in *Arch*) nor damages for the losses it sustained. Instead, CMI amended the bonus plan to deter the exercise of the Union's right to call memorial days in the future. Nothing in CMI's reaction at the time indicates it thought the Union's calling for memorial day work stoppages was not authorized by the CBA.

---

and ratified the Fourth Amendment stipulated that controversies over the meaning of "seizure" should be resolved by resort to four specific documents that discussed the term's "history and purpose." In this unlikely scenario, we imagine our dissenting colleague would agree that the referenced materials would be due considerable weight. And if one of them provided a clear answer to the question at hand and was not contradicted by any other, it would be quite helpful. That is how we view *Arch* on the question of the meaning of "memorial periods."

Although the text of the CBA may be inconclusive, the discussion of the memorial periods clause in the stipulated materials and CMI's response to the work stoppages "make[] clear the meaning of the contract." *See Whiting v. AARP*, 637 F.3d 355, 363 (D.C. Cir. 2011). This extrinsic evidence shows that, in this contract, "memorial periods" is a term of art with a specific meaning: a contractually authorized work stoppage that can be called for any reason, no reason, or for the specific reason of placing economic pressure on an employer in connection with an arbitrable dispute. CMI presented no extrinsic evidence showing a contrary meaning. The clause is a clear expression that the parties agreed the Union could call a limited number of work stoppages in connection with arbitrable disputes. It is "a limited exception to [the] . . . implied no-strike obligation." *Gateway Coal*, 414 U.S. at 385.

Finally, CMI raises the strained argument that the work stoppages were not protected because the Union's designation of memorial days is not really employee activity. CMI relies on *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), which held that certain actions by union organizers who were not employees were not protected. That principle does not apply, however, to action by a union selected to represent employees. *See Venetian Casino Resort, LLC v. NLRB*, 484 F.3d 601, 609 n.7 (D.C. Cir. 2007) ("[I]t would be a curious and myopic reading of the Act's core provisions to hold that, although employees are free to join unions and to work through unions for purposes of 'other mutual aid or protection,' the conduct of the unions they form and join for those purposes is not protected by the Act." (quoting *Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 29 (D.C. Cir. 2001)) (internal quotation marks omitted)). In any event, as the Board pointed out, here the CMI employees themselves urged the Union to call the memorial days and decided

individually whether to participate. Their participation in the 2004 memorial days was protected by the Act.

## III

The parties also stipulated that we use the test set forth by the Board in *Wright Line* to determine whether CMI's amendment to the bonus plan violates sections 8(a)(3) and (1) of the Act. These sections ban "adverse employment action [taken] to discourage union activity," *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 104 (D.C. Cir. 2003), and motive is our chief inquiry, *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 311 (1965) ("It has long been established that a finding of violation under [section 8(a)(3)] will normally turn on the employer's motivation."). The *Wright Line* test determines whether an employer's motive for adverse action is unlawful. *See Wright Line*, 252 N.L.R.B. at 1089; *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (approving the *Wright Line* test). Under *Wright Line*, the General Counsel is required to "make a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision" to take adverse action. *Wright Line*, 251 N.L.R.B. at 1089. The burden then shifts to the employer to show, by a preponderance of the evidence, that it would have taken the same action even if the employees had not engaged in protected activity. *Id.* We uphold a Board finding supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Southwire Co. v. NLRB*, 820 F.2d 453, 459 (D.C. Cir. 1987).

The Board found that the General Counsel had met his initial burden because "it is undisputed that the employees' memorial day work stoppages were a motivating factor in [CMI's] decision to modify its bonus plan." *P&M*, 355

N.L.R.B. at 1211. Indeed, the parties stipulated that the amendment to the bonus plan "was implemented in response to the Memorial Days called by the Union at the North River Mine in 2004," and that the amendment "was intended to communicate to the Union that because such Memorial Days imposed financial consequences on the Employer, the Union-represented employees would also be required to bear financial consequences in the form of the loss of the bonus they might otherwise expect." Stip. ¶¶ 34, 36.

CMI argues that it would have amended the bonus plan even had the Union never called the memorial days. CMI was not looking backward when it amended the plan, but forward, so the explanation goes. Memorial days cost everyone dearly. Decreased productivity decreases revenue which decreases profits. Discouraging these work stoppages would increase profits and bonuses for the employees. The Board rejected the claim that CMI was motivated only by these business concerns because, "[s]imply put, [CMI] acknowledges modifying the employees' bonus plan, in a restrictive manner, as a result of the North River employees' protected activity." *P&M*, 355 N.L.R.B. at 1214. CMI was, in fact, looking backward, and there is no doubt the Board was correct on this score. The question under *Wright Line* is not just whether the employer's action also served some legitimate business purpose, but whether the legitimate business motive would have moved the employer to take the challenged action absent the protected conduct. *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1339 n.7 (D.C. Cir. 1995) (explaining that in "dual motive" cases, "in which the employer acts with a legitimate and an illegitimate motive[,] the purpose is to determine whether the legitimate motive would have caused the action on its own"). Given CMI's concession, the Board reasonably concluded that CMI did not make that showing.

Because CMI admitted that the amendment to the bonus plan was motivated by protected activity, the Board also reasonably discounted CMI's reliance upon evidence that it was not generally hostile to the Union, such as the one-time 6% bonus and CMI's longstanding relationship with the Union. Some *Wright Line* cases consider such circumstantial evidence, but it can never trump a showing that a particular action was taken because of protected activity. Where that is established — and here it is conceded by CMI — evidence that the employer is not generally hostile to the union is of little avail. The emphasis is always on the employer's motivation for the particular act that discouraged union activity. The ultimate inquiry is whether there is a "link, or nexus, between the employees' protected activity and the adverse employment action." *Tracker Marine, LLC*, 337 N.L.R.B. 644, 646 (2002); *see also Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 424 (D.C. Cir. 1996) (assessing evidence of general anti-union animus to conclude that a particular employee was discharged "because of his union activity"). Although it is unusual for an employer to directly acknowledge taking adverse action because of protected activity, CMI did so here. *Cf. E.C. Waste, Inc.*, 348 N.L.R.B. 565, 574 (2006) (finding a section 8(a)(3) violation where the employer changed its annual bonus practice and specifically admitted that its motivation for the change was that the affected employees had voted to be represented by a union).

Even so, CMI argues that amending the plan was a permissible economic weapon to counter the employees' protected activity, much like a lockout in response to a strike. This economic weapon defense has been developed in bargaining cases applying the framework set out in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). The Board "decline[d] to consider this argument," however, stating that "the alternative *Great Dane* analysis" was "inconsistent with

the terms of the stipulation" that the case be decided under *Wright Line*. *P&M*, 355 N.L.R.B. at 1214. In any event, the Board held, CMI could not benefit from the economic weapon defense because its amendment to the plan was "precisely" the type of "selective sanction" directed "only [at] those employees who engage in protected conduct" that the Board forbids. *Id.* at 1214 n.11 (citing *Schenk Packing Co.*, 301 N.L.R.B. 487, 490-91 (1991) (finding the grant of bonuses only to employees who chose not to engage in protected strike activity unlawful)).

CMI objects to the Board's "selective sanction" holding in its brief to this court, but did not do so before the Board. It thus runs headlong into section 10(e) of the Act, which provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Although the Board raised the selectivity theory on its own, CMI was obliged to seek reconsideration or rehearing before the Board if it wished to challenge that ruling on appeal. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982); *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 185 (D.C. Cir. 2006) ("Where, as here, a petitioner objects to a finding on an issue first raised in the decision of the Board . . . the petitioners must file a petition for reconsideration with the Board to permit it to correct the error (if there was one).").

But the Board, curiously, failed to raise the section 10(e) argument before us, and so we must ask whether its limitation is "jurisdictional." The Supreme Court has recently cautioned courts to distinguish carefully between jurisdictional conditions, which cannot be waived or forfeited by the parties, and mere claim-processing rules or elements of a

cause of action, which can. *See Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243-44 (2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510-14 (2006). An examination of the "condition's text, context, and relevant historical treatment," *Reed Elsevier*, 130 S. Ct. at 1246, makes it clear that section 10(e) falls on the jurisdictional side of the divide.

First, section 10(e)'s text is virtually identical to section 313 of the Federal Power Act, which we have held is a model of the "clear and unequivocal statement" required to make exhaustion a jurisdictional prerequisite. *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 962-63 (D.C. Cir. 1999); *see Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 876 F.2d 109, 113 (D.C. Cir. 1989) ("Neither FERC nor this court has authority to waive these statutory requirements.").[7] And although we have not previously been presented with this precise question, we have repeatedly indicated that section 10(e) is jurisdictional in the true sense of the word. *See, e.g.*, *W&M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008) (describing section 10(e) as a "jurisdictional bar" in the face of which we are "powerless . . . to consider arguments not made to the Board"); *Parkwood Developmental Ctr., Inc. v. NLRB*, 521 F.3d 404, 410 (D.C. Cir. 2008) (explaining that section 10(e) meant "we have no jurisdiction to entertain [a] claim"); *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999) ("A court of appeals altogether 'lacks jurisdiction to review objections that were not urged before the Board.'" (quoting *Woelke*, 456 U.S. at 666)). By "speak[ing] to the power of the court rather than to the rights or obligations of the parties,"

---

[7] Section 313 provides that "[n]o objection to the order of the [Federal Energy Regulatory] Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 16 U.S.C. § 825*l*.

the text displays the hallmark of a true jurisdiction-limiting provision. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994).

Looking next to the statutory context, the Court in *Reed Elsevier* and *Arbaugh* found it significant that the requirements at issue there were "located in . . . provision[s] 'separate' from those granting federal courts subject-matter jurisdiction." *Reed Elsevier*, 130 S. Ct. at 1245-46. By contrast, section 10(e) not only bars arguments not made to the Board but also grants and defines the jurisdiction of courts of appeals over petitions for enforcement of Board orders. *See W&M Props.*, 514 F.3d at 1345 ("Section 10 . . . creates and limits our jurisdiction to review the Board's orders.").

Finally, section 10(e)'s purpose also indicates it is jurisdictional. It "is intended to further 'the salutary policy . . . of affording the Board [the] opportunity to consider on the merits questions to be urged upon review of its order,'" *Elastic Stop Nut Div. of Harvard Indus. v. NLRB*, 921 F.2d 1275, 1284 (D.C. Cir. 1990) (quoting *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256 (1943)), and "is an example of Congress's recognition that '. . . courts should not topple over administrative decisions unless the administrative body has not only erred but has erred against objection made at the time appropriate under its practice,'" *id.* (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). *See also Cast N. Am. (Trucking) Ltd. v. NLRB*, 207 F.3d 994, 1000 (7th Cir. 2000) ("This is a jurisdictional bar, designed to allow the NLRB the first opportunity to consider objections and to ensure that reviewing courts receive the full benefit of the NLRB's expertise."). Section 10(e)'s bar is far from mere "claim-processing rules" such as most statutes of limitation. *See Arbaugh*, 546 U.S. at 510.

The text, context, and purpose of section 10(e), as well as our precedent addressing both it and similar statutes, demonstrate that it is an unavoidable limitation on our jurisdiction. We are thus powerless to consider CMI's objections to the Board's selective sanction holding despite the Board's failure to raise section 10(e).

IV

CMI raises two more defenses to the section 8(a)(3) charge and objects to the Board's chosen remedy. First, CMI argues that the Union waived its ability to bring an unfair labor practice charge by giving CMI the unilateral right to modify the bonus plan in the Letter of Agreement. However, the Board was correct that the unilateral right to amend the plan was not a license to amend the plan for unlawful reasons. *P&M*, 355 N.L.R.B. at 1214 (citing *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1281 (D.C. Cir. 1999)). There is no indication in the record that the Union intended to waive its section 8(a)(3) rights by entering into the Agreement, and a waiver of statutory rights must be "clear and unmistakable." *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 (D.C. Cir. 1993). "[C]ourts may 'not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated.'" *Id.* (quoting *Metro. Edison Co.*, 460 U.S. at 708). CMI had no right to amend the plan with the intent to discourage future protected activity. *See Reno Hilton*, 196 F.3d at 1281 ("[T]he record is devoid of evidence to infer, much less show, that the Union waived its § 8(a)(3) rights by entering into the agreement.").

Second, according to CMI, the fact that no employee was denied a bonus under the amendment shows that it did not "actually affect the terms or conditions of employment" as

required to find a section 8(a)(3) violation. Pet'r's Br. 41-42 (quoting *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 212 (4th Cir. 2005), which found that a mere counseling letter advising an employee to change his behavior was not a change in a term or condition of employment). The Board rejected that argument, and so do we. The plan amendment altered terms governing employee bonus eligibility by placing a financial penalty on the future exercise of protected activity. Indeed, as the Board noted, the Union's decision not to call memorial days that were not district-wide likely demonstrates the chilling effect of this new term of employment. *P&M*, 355 N.L.R.B. at 1214 n.8.; *see also Ford Motor Co.*, 131 N.L.R.B. 1462, 1487 (1961) ("It is not necessary . . . for the employee to have an actual monetary loss.").

Lastly, CMI objects to the Board's backpay remedy because no employee was denied a bonus. This objection, however, is premature. Although CMI is correct that the Board must tailor remedies to actual losses, it is well-established that "compliance proceedings provide the appropriate forum" to consider objections to the relief ordered. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984); *see also Ark Las Vegas*, 334 F.3d at 107 ("[W]e 'leav[e] until the compliance proceedings more specific calculations as to the [relief], *if any*, due.'" (quoting *Sure-Tan*, 467 U.S. at 902) (alterations in original)).

V

For the foregoing reasons, CMI's petition for review is *denied* and the Board's cross-application for enforcement is *granted.*

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, dissenting: Collective Bargaining Agreements ("CBAs") between the United Mine Workers of America ("UMWA") and Chevron Mining allow the union, on reasonable notice to the employer, to "designate memorial periods not exceeding a total of ten (10) days during the term of this Agreement." Joint Appendix ("J.A.") 96. The CBAs also contain provisions requiring arbitration of disputes. Under established authority, see *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 381 (1974), such provisions forbid strikes, as the court recognizes, see Maj. Op. at 5. The NLRB nonetheless construed the memorial-period clauses to create a de facto exception to the strike ban, and the court affirms. The conclusions of both the agency and the court violate the established principle (most familiar to us from anti-discrimination laws) that a right to do a thing at will, or for no reason at all, does not normally encompass a right to do it for reasons that contradict rights reserved to another party (here, the employer's right not to be subject to strikes while the CBAs are in effect). See *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2560-61 (2011) ("[I]f the employer can show that it took an adverse employment action against an employee for any reason other than discrimination, the court cannot order the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any backpay.") (internal quotation marks and citation omitted); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) (noting that an employer's "blunt" and even "unfair" behavior does not in itself support "an actionable claim of discrimination").

To reach its conclusion, the court makes a rather odd use of a stipulation that the parties agreed on before the Board, namely, that "[t]he history and purpose of the Memorial Periods Clause was addressed" in various named documents. J.A. 12-13 ¶ 17. The court (1) gives this provision a far more powerful meaning than its text will bear; (2) selects one

document from among the four for a wholly dominant role, namely one district court decision, *Arch of W. Va. v. Mine Workers Local Union 5958*, C.A. No. 2:96-2008 (S.D. W. Va. Nov. 25, 1996) ("*Arch*"); and (3) misreads that one document. First, the stipulation appears to mean no more than would a parallel statement about Farrand's: "The history and purpose of the United States Constitution is addressed in Max Farrand's THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES (1913)." This would not license a constitutional interpreter to exalt one passage in Farrand's above all others, or to disregard ordinary principles of law such as the one noted above—that a right to do something for no reason commonly doesn't entail a right to do it in ways or for purposes that frustrate another party's established rights. The parties' stipulation did not require the Board (or us) to pitch such principles overboard. Second, while the court says that the other three documents don't contradict its reading of *Arch*, it is equally true that none of them hints at anything like the view the court here ascribes to *Arch*.

Third and most important, the court's preferred item, the district court decision in *Arch*, provides only the most dubious support for the court's conclusion. The union there sought employer permission "to allow any individuals employed at [specified plants] to go deer hunting during the first week of the deer hunting season." *Id*. at *3-4 ¶ 6. When it did not receive this permission, the union first "threatened to call a 'memorial period,'" on Monday, Tuesday, Wednesday, and Saturday, November 25, 26, 27, and 30, 1996, if the employer did not make concessions on the deer hunting issue. When it did not, the union called a memorial period for those days. *Id*. at *4 ¶¶ 8-10. The *Arch* decision does not specify this, but it strongly suggests that the union members used the memorial days simply as an alternate means to take the deer hunting leave that their employer had refused. Indeed, the Board, in the decision under review in this case (which bears Chevron's

prior name, *see* Petitioner's Br. i), recognized this aspect of *Arch*, saying that the union there used memorial periods to "take advantage of the opening of hunting season." *Pittsburgh & Midway Coal Mining Co.*, 355 NLRB 1210, 1213 (2010); *but cf. id.* at 1213 (saying that the union's purpose was "to further its position in a dispute over a contractual attendance rule"). (In 2011 the deer hunting season opened November 21 and closed December 3, *see* WEST VIRGINIA DEP'T OF NAT. RES., HUNTING AND TRAPPING: JULY 2011 - JUNE 2012 REGULATIONS SUMMARY (2011), *available at* http://www.wvdnr.gov/hunting/Regs1112/2011_ Hunting_Regs.pdf). Thus the union members in *Arch* seem to have used the memorials for sport rather than for a strike.

The *Arch* decision contains, to be sure, far broader language than the case warranted. Having said that the clause entitled the union to exercise its right to memorial days for "good or bad reasons," it simply leapt to a characterization of the right as "a bargaining chip that the Union can use in an often 'fractious' relationship . . . between labor and management." *Arch*, at *6 ¶ 6. It never considered or alluded to the principle that prevents a party from using broadly formulated rights to sweep aside rights held by others. The upshot, then, of the court's opinion here is to subordinate that principle to a district court's dictum.